B.F. PITMAN III; Kim I. Manning; J. Brian O'Connor; Michael H. Bertino, M.D.; Fred L. Baker; Lawrence F. Haass; Rodolfo Davila, Trustee of The Rodolfo L. Davila Estate Trust; and Frank Davila II, Appellants,

v.

O. Waymond LIGHTFOOT, Jr.; William R. Fields, Jr. and His Estate in Bankruptcy through Intervenor John Patrick Lowe, Trustee, Appellees.

No. 04–93–00480–CV.

Court of Appeals of Texas,
San Antonio.

Aug. 7, 1996.

Bruce Robertson, Jr., Law Offices of Bruce Robertson, Jr., Walter C. Wolff, Jr., Ruth Lown, Wolff & Wolff, Kim I. Manning, Paul M. Green, Lang, Ladon, Green, Coghlan & Fisher, P.C., Jerry N. Dennard, San Antonio, for Appellants.

Stewart J. Alexander, Robert D. Reed, Law Offices of Robert D. Reed, P.C., Robert W. Wachsmuth, The Kleberg Law Firm, Thomas H. Crofts, Jr., Crofts, Callaway & Jefferson, P.C., Ron A. Sprague, Gendry & Sprague, P.C., San Antonio, for Appellees.

Before LOPEZ, STONE and SHIRLEY W. BUTTS,[1] JJ.

## OPINION

LOPEZ, Justice.

Appellees, William R. Fields, Jr. and O. Waymond Lightfoot, Jr., filed suit against appellants, Fred L. Baker, Frank Davila II, Rodolfo Davila, Trustee of the Rodolfo Davila Estate Trust (together, the Davilas), Lawrence F. Haass, J. Brian O'Connor, Kim I. Manning, J. Pat O'Connell, Brian O'Connor, B.F. Pitman III, and others, for breach of contract and other related tort theories. Fields' trustee in bankruptcy, John Patrick Lowe, intervened in the case. Appellees' theories of recovery concern a purported agreement with the appellants to purchase bank holding company stock from the appellees for which payment was not made. After a jury verdict, the trial court granted a judgment in favor of the appellees, from which appellants now bring an appeal raising 104 points of error. We affirm the trial court's judgment in part, and reverse and render in part.

## BACKGROUND

Appellants, appellees, and other individuals were investors in Crown Bancshares, Inc., a bank holding company (Crown Bancshares). Incorporated in June of 1985, Crown Bancshares owned all the stock of Crown Bank, N.A. (Crown Bank). The incorporating officers and directors were Bernard Austin and appellants, Frank Davila II, Lawrence F. Haass, and Brian O'Connor. The Federal Reserve approved Crown Bank's application in August of 1985, and capital stock in Crown Bancshares was privately offered beginning in October of 1985.

---

1. Justice Shirley W. Butts not participating.

Beginning in February of 1986, the bank was capitalized through a series of loans to 28 purchasers of Crown Bancshares stock, including appellants and appellees, in the aggregate amount of $5,066,310.00, from First State Savings Association (First State). Fields purchased 10,000 shares of Crown Bancshares stock (at $10 per share), with $5,000.00 in cash and $95,000.00 borrowed from First State. With a two percent origination fee, Fields' loan was in the amount of $96,900.00. Lightfoot purchased 30,000 shares of Crown Bancshares stock (at $10 per share), with $15,000.00 in cash and $285,-000.00 borrowed from First State. With the two percent origination fee, Lightfoot's note to First State was for $290,700.00. The purchasers pledged their Crown Bancshares stock to First State as security for the loans. These agreements also contained cross-default provisions—a default by one borrower equaled a default by all borrowers.[2] In the event of a default, First State could "declare the entire unpaid balance of principal and all earned interest on the Indebtedness immediately due and payable." Each of the borrowers, except Lightfoot and Dr. Richard Rouse, also signed personal guaranty agreements.

A series of agreements were concluded: a voting trust agreement, a stock repurchase agreement, an agreement for funding repurchases of Crown Bancshares, a repurchase agreement concerning the capital stock of Crown Bancshares, and an amendment to the voting trust agreement. Although these agreements were prepared in 1985—1985 is typed on various pages—they were all apparently signed in February of 1986. These agreements were signed by both the appellants and appellees.

The purpose of the voting trust agreement was to maintain Crown Bancshares as a closely-held corporation. The organizers of the bank had determined that a voting trust agreement should be signed so that a majority of the subscribers of Crown Bancshares stock could maintain control over the direction and operation of the bank. Through the voting trust agreement, a majority of the shareholders subscribing to the agreement would control the vote at the shareholders' meeting and elect the directors of Crown Bancshares which, in turn, owned and controlled Crown Bank. The stated purpose of the voting trust agreement was to "secure continuity and stability of policy in management, and to establish constructive administration of the business of the Company...." The voting trust agreement signed by the parties referred to them as "subscribers," but the parties often used the term "Control Group" to describe themselves. All of the appellants (except Rodolfo Davila, individually) and appellees were members of the Control Group.

Although it was originally intended that the trustee under the voting trust agreement was to have all the stock of Crown Bancshares issued in his name as trustee, with the trustee then issuing voting trust certificates to the various shareholders to evidence their stock ownership, the stock of the holding company was not issued that way. No stock was tendered into the voting trust. Instead it was issued separately in the name of each subscriber. First State required that all such stock, upon the closing of the loan to purchase, be physically pledged to First State and that each subscriber sign an "irrevocable stock power" as to the stock and deliver it to First State at the time they signed the other loan documents. The voting trust agreement was signed only by members of the Control Group; neither Crown Bancshares nor First State were parties to the agreement. The subscribers to the voting trust agreement appointed Dwight L. Lieb—the largest Crown Bancshares stockholder—as the voting trustee.

The voting trust agreement defined the powers and duties of the voting trustee. The agreement contained a "Grant of Irrevocable Proxy and Power of Attorney," which reads as follows:

In addition to all other rights and powers granted under this Agreement, during the term hereof each Subscriber by execution of this Agreement irrevocably names, con-

2. Defendants' Exhibit 13, Fred L. Baker's Pledge and Security Agreement, defines "default" as "the failure of DEBTOR or any individual Share-holder of CROWN BANCSHARES, INC. to pay the Indebtedness of any part thereof as it becomes due...."

stitutes and appoints Trustee (or successor Trustee) his true and lawful attorney and agent with full power of substitution, to vote all shares of stock deposited with Trustee by such Subscriber, subject to the requirements of Section 4 hereof, at any and all regular and special meetings of the Company's shareholders whenever and wherever held during the term of this Agreement, or at any adjournment thereof, and hereby ratifies and confirms all that the said Attorney might do. DURING THE TERM HEREOF, THE PARTIES HERETO AGREE THAT THE PROXY HEREBY GRANTED IS COUPLED WITH AN INTEREST AND IS IRREVOCABLE.

An amendment to the agreement further provided:

Any Trustee then serving shall have the power and authority to designate agents, and in such connection, to execute and deliver Powers of Attorney designating any person or group of persons to act in his full place and stead, to have and perform any and all powers, duties, acts and discretions as set forth in such written Power of Attorney to the fullest extent permitted by applicable law. *Any person dealing with said Trustee shall be entitled to rely upon such Power of Attorney as fully authorizing the exercise of such powers, acts and discretions as therein set forth.*

(Emphasis added).

The Control Group comprised nearly 75 percent ownership of Crown Bancshares. The voting trust subscribers selected the board of directors of Crown Bancshares. The directors of the holding company then elected the directors of Crown Bank who, in turn, selected a slate of officers for the bank. Most, if not all, of these individuals were members of the Control Group.

Sometime after agreeing to participate in the bank's formation, appellees decided to withdraw from the enterprise. During the trial of this case, Lightfoot testified that he first decided to sell his Crown Bancshares stock in the latter part of 1985 or early 1986. According to Lightfoot's testimony, he approached the president of Crown Banc-

shares, Brian O'Connor, and told him that, due to personal and business difficulties, he could no longer bear the financial cost of purchasing and paying for 30,000 shares of stock. O'Connor asked Lightfoot to wait because a sale by an incorporating bank director might impede final regulatory approval of the bank.

When Lightfoot again raised the question of a stock repurchase, Lieb, the voting agreement trustee, said he would call a meeting of the board of directors of Crown Bancshares and convey Lightfoot's need to sell the shares. The first indication of an agreement to repurchase Lightfoot's stock is found in the minutes of a June 9, 1986 Crown Bancshares Board of Directors meeting, which read in part as follows:

Mr. [J. Brian] O'Connor informed the Board that Director O. Waymond Lightfoot has offered 25,000 shares of Crown Bancshares stock for sale to the holding company as prescribed by the repurchase agreement. The Board waived the corporation's right to purchase the stock and determined that it was in the best interest of the holding company to offer the stock to outside investors. A recommendation was made to the signatories of the Crown Bancshares, Inc. stock repurchase plan to waive their right to purchase the stock and make it available to new investors.

On June 27th the Board met again. The minutes of the board meeting state that "O'Connor updated the board on the status of the proposed stock sale of O. Waymond Lightfoot. He indicated the shares would soon be ready to be offered for sale."

Fields also decided that he wanted to sell his stock. During March of 1987, Fields indicated to Lieb that he was prepared to sell his stock in Crown Bancshares for $10 a share. The first written indication of an agreement to purchase Fields' shares is found in a April 27, 1987 letter from Fields to Lieb. Fields' letter reads in part as follows:

This letter confirms our agreement whereby you, or your assignee, purchased 9,000 Crown Bancshares from me on Monday, April 27, 1987, at $10.00 per share. As mentioned to you, $87,210 principal is out-

standing on the shares purchased by you; interest has been paid through March 31, 1987.

Lieb apparently apprised First State of the Control Group's purchase of Lightfoot's stock on January 15, 1987. Handwritten notes from a meeting with Randy Cadwallader, a First State loan officer, show that "Lightfoot's Crown Bank stock [is] to be transferred over to the Control Group."

On May 19, 1987, Lieb wrote to the Control Group about the agreement to purchase Fields' and Lightfoot's shares. According to Lieb's letter, in June of 1986 the Control Group had agreed to purchase 83.3 percent of Lightfoot's shares and in April 1987, to purchase 90 percent of Field's shares:

> Dear Control Group Member:
>
> The Control Group has purchased certain shares from Waymond Lightfoot and Ray Fields, 25,000 shares and 9,000 shares, respectively. The agreement with Mr. Lightfoot was made in September, 1986, and with Mr. Fields in April, 1987. An explanation of each transaction is enclosed herewith, together with an analysis of the amount owed by each Control Group member.

Lieb's accompanying explanation stated that "[t]he principal balance outstanding on Mr. Lightfoot's stock on 10/01/86 amounted to $290,700.00. On that date, the Control Group repurchased 25,000 shares of stock from Mr. Lightfoot at $10/sh." As for Fields, the explanation further stated: "The principal balance outstanding on Mr. Field's note on 4/20/87 amounted to $96,900.00. On that date, the Control Group repurchased 9,000 shares of stock from Mr. Fields at $10 per share." Both Lightfoot and Fields testified that these statements accurately described their agreements with the Control Group. The letter concluded: "Please make your check payable to Dwight L. Lieb, Trustee for the Control Group, and forward same to me at Crown Bank." Lightfoot said this letter accurately represented the agreement he thought he had with the Control Group.

Lightfoot recalled that he was to be paid by the Control Group, but that it made no difference to him whether appellants performed the agreement either by paying cash or by assuming the indebtedness to First State. He assumed, however, that appellants had chosen to pursue payment by assuming his indebtedness with First State. Lightfoot continued to serve as a director of Crown Bancshares and Crown Bank, and continued to attend board meetings. He said he was aware of the purchase of Fields' stock when he received Lieb's May 19 letter.[3]

Appellants recalled these events differently. Baker, for example, denied—and continues to deny—that he ever gave Lieb authority to buy Fields' or Lightfoot's stock under the terms of the agreement described in Lieb's May 19, 1987 letter. Baker, like all of the other appellants, testified that in order to buy Fields' or Lightfoot's stock, it would have been necessary to have the stock purchase financed by First State Savings, using the stock as security. But, First State never agreed to refinance Fields' and Lightfoot's stock. Nor did Baker recall ever giving Lieb authority to purchase Fields' or Lightfoot's stock.

On April 27, 1987, Fields wrote to Lieb confirming what he called,

> "our agreement whereby you, or your assignee, purchased 9,000 Crown Bancshares from me on Monday, April 20, 1987, at $10.00 per share. As mentioned to you, $87,210 principal is outstanding on the shares purchased by you; interest has been paid through March 31, 1987.
>
> "A check for $2,790.00, less the interest owed to April 20, 1987, should be forwarded to me ... "

On August 6, 1987, the Control Group issued a check to Fields for $2,700. Fields claimed this figure represented his equity in the 9,000 shares he had sold to the Control Group. Each Control Group member sent Lieb his prorata contribution for 90 percent of the principal and interest due on Fields' note to First State.

---

**3.** The jury found the May 19, 1987 document "constituted an agreement whereby the Control Group bought 25,000 of Lightfoot's shares of

Crown Bancshares Stock" and 9,000 shares of Fields' Crown Bancshares stock.

Meanwhile, Lightfoot continued to receive past-due notices from First State. On June 10, 1987, he received a letter from Pam Pilgrim, a loan processor with First State, which informed him that his loan had been in default since December 20, 1986. The letter added: "I have been informed that you are working with the Control Group in regards to the purchasing of approximately 83% of your crownbanc stock. The fact remains, however, that your loan is delinquent and you are responsible for this obligation." Lightfoot recalled asking the Control Group on several occasions why he was receiving these notices and, more specifically, about the progress of the transaction; he testified that he was assured each time that it was just a matter of "paperwork," that it was being "handled," and that they were in control of the situation.

Like Fields, Lightfoot testified that he paid only the interest attributable to his retained shares after the alleged purchase. A handwritten letter received by Lieb in March of 1987 states that "[t]hese are the payments I have made against the stock. The sale was originally proposed for June of 1986. The transfer was for $250,000 but I am willing to transfer all of it. My financial commitments have increased dramatically due to other insurance related activities." The letter is signed "Waymond" and is written on Waymond Lightfoot's personal stationery. Accompanying the letter are four checks from the Harris and Lightfoot Insurance Agency.

Lightfoot and Fields both testified that they were repeatedly assured payments were being made on their loans. The record contains photocopies of several checks from Lieb, the voting trustee, to First State for principal and interest due on their loans to First State. On September 28, 1987, the Control Group issued a check to First State for $6,923.18. This figure represented 90 percent of the principal and interest due on Fields' note as of September, 1987. Fields testified that he paid—and continued to pay—the remaining 10 percent, having retained 1,000 of his original 10,000 shares.

Although the Control Group never paid Lightfoot's equity, it issued—through Lieb as Trustee—a check to First State for $7,267.21. This amount represented 83 percent of the principal and interest due on Lightfoot's note in September of 1987. Lightfoot stated that he was never informed the Control Group had stopped making payments to First State.

On October 20, 1987, Lieb again wrote to the Control Group:

Enclosed please find a statement for your prorata share of the interest payable to First State for the shares purchased by the Control Group from Waymond Lightfoot and Ray Fields. First State is very anxious to receive payment by Friday, October 23, 1987, and your check by return mail, payable to Dwight L. Lieb, Trustee for Control Group, sent to the bank will be appreciated.

At an October 1987 meeting, the Control Group [4] discussed the status of this matter as well as delinquent loans of minority (non-Control Group) stockholders. The minutes also indicate that "First State had never prepared documents necessary to refinance the shares of Waymond Lightfoot and Ray Fields which the members of the Control Group agreed to purchase in 1986." The Control Group directed that a $50,000.00 letter of credit be obtained and provided to First State to cover delinquent principal and interest on all notes held by First State and to bring cash contributions of all Control Group members current.

On October 27, 1987, the Control Group's attorney, Neil Boldrick, Jr., wrote to First State that several "adjustments" to the original $5.2 million notes were necessary, e.g., "restructuring of the Lightfoot and Fields Notes and complete financing for new investors of the Gamboa, Flume, Japhet and O'Connor Notes."

In December of 1987, Dennis Jones, an assistant vice president with First State, advised Neil Boldrick that "[a]s all parties are well aware, certain of the loans are presently in default, and have been in default for a

---

4. According to the minutes of the meeting, the following shareholders were present: Dwight Lieb, Frank Davila II, B.F. Pitman III, Kim Manning, Michael Bertino, Richard Rouse, J. Brian O'Connor.

period of time beyond thirty (30) days...." Jones also advised Boldrick that "First State Savings is willing to accommodate your clients." Jones' letter added that "[i]f, after reasonable efforts on the part of your clients, they are unable to bring the loan current, then, upon transfer of the stock or a letter instructing us to transfer the stock to Dwight Lieb, Trustee, and payment of all past-due interest, we will reinstate the applicable loan." The letter further advised Boldrick that First State held a letter of credit and certificates of deposit that could be used to pay past due interest if the Control Group so desired. Jones later testified that First State never provided financing for loans to purchase Fields' or Lightfoot's stock and that his letter to Boldrick never specifically addressed the question. Rather, it addressed the problem of the Control Groups' delinquent loans and what was necessary to reinstate them.

On February 12, 1988, Lightfoot received another letter from First State informing him that the note for $290,700.00 "executed by O. Waymond Lightfoot and payable to First State Savings" was now in default. The letter demanded payment for $28,534.28 in past due interest on or before February 25, 1988.

On February 22, 1988, the Control Group met at the home of Frank Davila II. The apparent subject of the meeting was a memorandum written by Frank Davila II and addressed to the "File" which questioned whether the Control Group had ever agreed to purchase Fields' and Lightfoot's stock. Davila observed that "[a]n effective transaction concerning the sale or transfer of the stock would involve, among other things, the approval of First State Savings to finance the purchase of the said stock"; and that "Dennis Jones of First State Savings told Fred Baker and myself that at no time had there been an agreement by First State Savings to finance such a purchase." Davila concluded by noting that:

> The ultimate disposition of said shares of stock will probably result in any case in the fact that the Control Group and its members are going to be saddled with obligations which were not fully foreseen

at the time that the written documents were executed. I feel very strongly, however, that there should not be ratification of a transaction which has not in fact occurred, and that the legal owners of the shares of stock in question should be the persons involved in the foreclosure and/or other proceedings which have or might be initiated by First State Savings.

This is my opinion, and perhaps I am the only person holding to this opinion, but I believe that each member present should take a yes or no position as to whether the transaction took place, and whether the Control Group and its non-delinquent members should be involved in any of the steps preceding the actual takeover of the stock by First State Savings.

Fields testified that Lieb interrupted a heated discussion between Frank Davila II and Fields by reassuring Fields that the Control Group had indeed purchased Fields' stock. Although Fields said he took that as a reassurance he was going to get paid, he continued to get notices from First State Savings reflecting 100 percent liability on the loan, as though he still owned 10,000 and not 1,000 shares. As before, however, Fields continued to pay 10 percent of the outstanding loan balance.

Fields recalled writing two separate checks for 10 percent of the interest due— one in June and another in September. He sent them directly to Fred Baker. Both payments were accompanied by a letter to Baker. Both letters specified the amount tendered and identified that amount as ten percent of the current interest payment due. The letters further noted that the interest on the balance of the note "should be paid by the Control Group pursuant to their purchase of my stock in April, 1987." Baker testified that he did not recall Lightfoot ever writing letters about either his stock or his down payment. As before, Fields asked for a copy of the minutes of the March, 1988 Control Group meeting and reminded Baker the account with First State was past-due:

> I am again requesting a copy of the minutes of this years [sic] meeting wherein it was again confirmed that the Control

Group purchased, in April 1987, 9,000 of my 10,000 shares of stock in Crown Bank. Please note on the enclosed statement of account from First State Savings that the Control Group still owes the amount shown as delinquent on the statement of account. I have been current on my share of the account since my purchase of the stock. It is again requested that the records at First State Savings be brought up to date accordingly and that I be notified that this action has been taken.

Fields said he never received a copy of those minutes, taken by Pitman, until he saw them in discovery prior to the trial of this case.

During February of 1988, Don Krause, an attorney for the Control Group, began negotiations with First State to refinance the $5.2 million capitalization loan. Refinancing was discussed during a March 7, 1988 meeting of the Control Group, which also confirmed Lieb's resignation as trustee. He was replaced by Fred L. Baker and Frank Davila II as co-trustees.[5] The Control Group also voted to renegotiate the entire First State $5.2 million loan on better terms. The minutes state that:

> Dwight Lieb delivered to Fred Baker a check in the amount of $24,266.44, such check representing the interest due on his loan to First State Savings, such interest calculated through 2–29–88. This payment is to be used only if the other members of the Control Group pay their pro-rata share of the amounts that are delinquent at First State Savings, and a restructuring of the debt at First State Savings is accomplished.

> Upon a motion made by B.F. Pitman and seconded by Ray Fields, Frank Davila and Fred Baker were appointed to work with Don Krause in the attempt to restructure the indebtedness at First State Savings. The motion passed unanimously.

The check for $24,266.44, along with additional cash contributions from other Control Group members, was supposed to bring the delinquent or defaulted loans current, thereby inducing First State to restructure the loans on better terms. First State had made

clear it would not do anything until the delinquent loans were made current—hence, the contributions. Baker continued to hold this money until February of 1990, at which point he said it became clear a restructuring of the loans could not be accomplished.

The Control Group never succeeded in restructuring their loans with First State. Don Krause testified that he tried his best to induce First State to restructure the loans but they never agreed to do so. Baker testified that in addition to Krause's efforts, he repeatedly talked to representatives of First State to try not only to get them to restructure all the loans on better terms, but also to make loans to finance the purchase of Fields' and Lightfoot's stock. Again, however, First State never did so. Baker, like Lieb, and Dennis Jones, a vice president in charge of regulatory compliance with First State Savings, considered refinancing the loans and financing the purchase of appellees' stock as separate issues.

Whether First State representatives ever intended to finance a stock purchase, the evidence certainly shows that Control Group members, including Baker, believed that First State was going to finance the purchase of appellees' stock. This belief was apparently based, at least in part, on statements made by representatives of First State who were in management when the original purchase money loans were made, but who were no longer with First State when discussions were later held to renegotiate the total indebtedness and finance the appellees' purchase.

There is also evidence that First State Savings was having financial problems long before the Federal Deposit Insurance Corporation (FDIC) took control of it in March of 1989. Beginning in April of 1987, First State was under on-site supervision of state, and later federal, banking regulators; there is testimony to the effect that their approval would have been required for any restructuring of loans or stock purchase financing.

On March 16, 1988, the Control Group met again and with Fields, Lightfoot, Frank Davila II and O'Connell abstaining, voted to

---

5. Lieb filed for bankruptcy in April of 1989.

confirm and ratify the purchase of Fields' and Lightfoot's stock. The handwritten minutes from the March 16, 1988 meeting—taken by Pitman—record that a "motion to confirm that the stock purchase is a valued transaction" was made, seconded and passed.[6] There is no mention of any financing conditions.

On March 25, 1988, Crown Bancshares filed its "Annual Report of Bank Holding Companies" for the 1987 fiscal year—the "FR Y-6" form—with the Federal Reserve. The FR Y-6 contained a list of the members of the Control Group and their individual percentages of ownership in Crown Bancshares. The report stated that Fields owned 1,000 shares and Lightfoot owned 5,250 shares. The report mentions no stock sale or financing conditions.

The FDIC took control of First State Savings on March 2, 1989. On June 26, 1989, Fields received his first official delinquency notice from the now federally-controlled First State Savings. In July, the FDIC again demanded payment from Fields for his full share of the initial capitalization loan, which represented 10,000 shares of Crown Bancshares stock.

In August of that year, Baker met with Donald Backer of the FDIC, in a final attempt to either restructure the notes with First State or refinance Fields' and Lightfoot's notes. Backer, however, maintained that he intended to deal with the Control Group borrowers on an individual basis. Baker reminded him that "if he was going to do that, then the transaction between the members of the Control Group and Mr. Fields and Mr. Lightfoot needed to be taken into consideration as he dealt with each individual." No agreement to refinance was reached.

On February 6, 1990, Co-Trustees Baker and Frank Davila II wrote to the Control Group that "it has become obvious that each of us will end up dealing with First State on

an individual basis." With this letter, Baker and Frank Davila II returned money the Control Group had contributed to the Trust in March of 1988 for renegotiation of their delinquent loans with First State. Fields received $451.97; Lightfoot received $2,410.28. Both Fields and Lightfoot recalled accepting and cashing their checks. Baker later testified that he returned "dollar-for-dollar" what had been contributed. He said he did not think he had the authority from the other Control Group members to turn all of the money over to either Fields or Lightfoot to pay for the stock purchase.

After receiving the letter and check, Fields, on February 10, 1990, wrote to Baker expressing his concern "that nothing has been accomplished to date regarding the transfer of the 9,000 shares of Crown Bancshares common stock purchased from me by Control Group members in April, 1987."

In October of 1990, Crown Bancshares' board of directors voted to liquidate and dissolve the bank. The resolution appointed Bernard Austin as the Liquidating Director and Trustee and provided that Crown Bancshares would distribute the remainder of its bank account to its shareholders on a prorata basis. Fields recalled receiving a liquidation distribution based on only 1,000 shares of stock.

In November of 1990, Austin sent the shareholders of Crown Bancshares, Inc. their purported prorata shares of the liquidation distribution—approximately $0.1254013 for each share held. On November 25, 1990, Austin wrote to Neil Boldrick that in connection with the liquidation, he was enclosing two cashier's checks for the firm's escrow account. One of the checks, registered in Fields' name, was for $1,128.61 and represented 9,000 shares of stock. The other check, registered in Lightfoot's name, was in the amount of $3,135.03 and represented 25,000 shares. The letter added that "[t]he

---

**6.** Although Control Group meetings were, in theory, closely structured, with set, ordered agendas, Fred Baker recalled that Control Group meetings often involved free-wheeling discussions and "were very difficult to chair and manage." Baker said he did not recall whether there was an affirmative vote to confirm the purchase of Fields' and Lightfoot's shares; however, he also admitted that he never asked to amend the minutes. Baker denied ever voting for a resolution confirming the purchase of Fields' and Lightfoot's stock in accordance with the terms of Lieb's letter.

9,000 shares and 25,000 shares listed above represent shares apparently purchased from Mr. Fields and Mr. Lightfoot by the Crown Bancshares, Inc. Voting Trust ('Control Group') but which shares have never been presented to the corporation for registration."

On June 26, 1991, Fields filed a voluntary petition under Chapter Seven of the U.S. Bankruptcy Code. Both Fields and Lightfoot were subsequently sued by the RTC for the full amounts of their First State notes.

Lightfoot testified that he realized for the first time that he would not be paid for his stock on October 10, 1991. On that day he attended a meeting with Fields, his lawyers, and various members of the Control Group. Lightfoot recalled there were "some extremely heated discussions and denials as to any responsibility for the debt and/or the purchase of Ray Fields' stock." Fields said that until February 6, 1990, he believed the appellants were in the process of performing the agreement.

Fields and Lightfoot filed this lawsuit on November 25, 1991 against Crown Bancshares, Inc., F. Bernard Austin, Fred L. Baker, Michael H. Bertino, M.D., Frank Cross, Frank Davila II, Rodolfo Davila, Israel Fogiel, Lawrence F. Haass, Roger Maley, Kim I. Manning, J. Pat O'Connell, J. Brian O'Connor, B.F. Pitman III, and Richard G. Rouse, M.D. The plaintiffs originally asserted causes of action for breach of contract, misrepresentation, fraud, breach of fiduciary duty (both as to the directors and trustees of Crown Bancshares), negligence, tortious interference with contract, and violations of article 581–33(B) of the Texas Securities Act.

The appellees' second amended petition (filed on December 14, 1992) dropped claims against F. Bernard Austin but added the Rodolfo L. Davila Estate Trust[7] as a defendant. The amended petition also dropped claims for tortious interference with contract, but added negligent misrepresentation and several additional theories of liability against the trustees and directors of Crown Bancshares. The appellees claimed that the directors, liquidating director, trustee, and cotrustees of Crown Bancshares failed to establish a "trust fund" for the benefit of Fields, Lightfoot and other creditors. They argued that the corporate entity of Crown Bancshares should be disregarded because it was the "alter ego" of the Control Group and because it was used as a "sham to perpetrate a fraud." The appellees further argued that the defendants' breach of contract resulted in a "loss of credit and/or injury to credit reputation of Fields and Lightfoot."

At the conclusion of the evidence, the trial court submitted four of the appellees' causes of action to the jury: (1) breach of contract; (2) breach of trustees' (Fred L. Baker and Frank Davila II) fiduciary duties; (3) breach of directors' (Fred L. Baker, Michael H. Bertino, Frank Davila II, Lawrence F. Haass, Kim I. Manning, J. Pat O'Connell, J. Brian O'Connor, B.F. Pitman) fiduciary duties; and (4) violations of the Texas Securities Act. After the jury found for the appellees on these issues, the trial court rendered judgment against the appellants on April 12, 1993. A default judgment was entered against Crown Bancshares. Defendant, Richard G. Rouse, received a summary judgment prior to trial. The case against him was severed, resulting in a separate appeal. In *Fields and Lightfoot v. Rouse,* No. 04–93–00067–CV (Tex.App.—San Antonio, December 15, 1993, writ denied) (unpublished), we affirmed the summary judgment in Dr. Rouse's favor.

The trial of this case lasted nearly three weeks and leaves a substantial record in its wake. Compounding the problem is the fact that appellants have brought 104 points of error scattered among four separate briefs. Fred Baker, for example, raises 35 points of error. B.F. Pitman, J. Brian O'Connor, Michael H. Bertino, and Kim I. Manning (hereafter Pitman) raise 29 points of error. Rodolfo Davila, Trustee of the Rodolfo L. Davila Estate Trust, and Frank Davila II, his brother (together, the Davilas), raise 23 points of error. Lawrence F. Haass raises 17 points of error. Each appellant's brief, in turn,

---

7. Rodolfo Davila testified that the Rodolfo Davila Estate Trust was set up by his father to oversee the estate after his death.

adopts the points of error and arguments contained in the other three. In addressing these arguments we have tried, whenever possible, to combine the relevant points of error and address them collectively. Whenever possible, we have also avoided addressing the appellants' points by their individual number, discussing them instead according to the issues they raise.

## DISCUSSION

### *Statute of Limitations*

All of the appellants raise "matter of law" points attacking the trial court's decision to submit the discovery rule in questions 20 and 21 of the jury charge. In answering questions 20 and 21, the jury found that Fields and Lightfoot either discovered or, in the exercise of reasonable diligence, should have discovered on February 6, 1990 that appellants would not perform the agreement. Appellants argue that the trial court erred in awarding judgment for Fields and Lightfoot under a breach of contract theory because, as a matter of law, the cause of action is barred by the four-year statute of limitations. We disagree.

This lawsuit was filed on November 25, 1991. The original petition named as defendants all of the appellants except the Rodolfo L. Davila Estate Trust, which was joined as a defendant when the appellees filed their second amended petition on December 14, 1992. As we have already noted, however, Lieb's letter to the Control Group regarding the Control Group's repurchase of the appellees' stock is dated May 19, 1987. Lieb's letter also references two earlier dates: September of 1986 for Lightfoot and April, 1987 for Fields. The appellees' second amended petition claims that under the alleged stock purchase agreement, the effective date of the transfer, for purposes of calculating principal, interest, and equity, was October 1, 1986 for Lightfoot and April 20, 1987, for Fields. However, all of these dates are well beyond the four-year limitations period for breach of contract claims. *See* TEX.CIV.PRAC. & REM. CODE ANN. § 16.004 (Vernon 1986). Unless the appellees' breach of contract claim somehow accrued or was tolled beyond November 25, 1987—four years before this lawsuit was

filed—it is barred by limitations. Fields and Lightfoot therefore offer three arguments designed to avoid the limitations period: (1) their claims against the appellants did not accrue until the appellants had a "reasonable time" to pay the money they owed; (2) the appellants acknowledged the debt; and (3) the "discovery rule" tolled the limitations period. This last argument will be the focus of our discussion.

When reviewing "matter of law" points, an appellate court employs a two-prong test. The court will first examine the evidence supporting the jury's finding, ignoring all evidence to the contrary. *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989); *see also* W. Wendell Hall, *Revisiting Standards of Review in Civil Appeals*, 24 ST. MARY'S L.J. 1135 (1993). If there is no evidence to support the finding, then the entire record must be examined to see if the contrary proposition is established as a matter of law. *Sterner*, 767 S.W.2d at 690. Only when the contrary proposition is conclusively established by the evidence do we sustain the point. *Meyerland Community Improvement Ass'n v. Temple*, 700 S.W.2d 263, 267 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.).

In *Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515 (Tex.1988), the court explained the nature and origin of the discovery rule:

We hold that the discovery rule is a plea in confession and avoidance. A plea in confession and avoidance is one which avows and confesses the truth in the averments of fact in the petition, either expressly or by implication, but then proceeds to allege new matter which tends to deprive the facts admitted of their ordinary legal effect, or to obviate, neutralize, or avoid them. This most closely describes the function of the discovery rule, which asserts that while the statute of limitation may appear to have run, giving rise to that appearance should not control.

A party seeking to avail itself of the discovery rule must therefore plead the rule, either in its original petition or in an amended or supplemental petition in response to defendant's assertion of the de-

fense as a matter of avoidance. A defendant who has established that the suit is barred cannot be expected to anticipate the plaintiff's defenses to that bar. A matter in avoidance of the statute of limitations that is not raised affirmatively by the pleadings will, therefore, be waived.

The party seeking to benefit from the discovery rule must also bear the burden of proving and securing favorable findings thereon. The party asserting the discovery rule should bear this burden, as it will generally have greater access to the facts necessary to establish that it falls within the rule.

*Id.* at 517–18 (citations omitted). The discovery rule does not excuse a party from exercising reasonable diligence in protecting its own interests. *Johnson v. Abbey,* 737 S.W.2d 68, 70 (Tex.App.—Houston [14th Dist.] 1987, no writ). The rule expressly mandates the exercise of reasonable diligence to discover facts of negligence or omission. *Black v. Wills,* 758 S.W.2d 809, 815 (Tex. App.—Dallas 1988, no writ). Moreover, the burden is on the party seeking the benefit of the discovery rule to establish its applicability. *Woods,* 769 S.W.2d at 518. Whether reasonable diligence was used is generally a question of fact unless the evidence is such that reasonable minds could not differ as to its effect; only then does it become a question of law. *Enterprise–Laredo Associates v. Hachar's, Inc.,* 839 S.W.2d 822, 837 (Tex. App.—San Antonio 1992), *writ denied per curiam,* 843 S.W.2d 476 (Tex.1992).

A breach of contract action is governed by a four-year statute of limitations. Tex.Civ. Prac. & Rem.Code Ann. § 16.004 (Vernon 1986). In applying this four-year limitations period,

a cause of action is generally said to accrue "when the wrongful act effects an injury, regardless of when the plaintiff learned of such injury." *Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 351 (Tex.1990). An exception to the general rule is known as the discovery rule and this rule is used to determine when the cause of action accrued. The discovery rule tolls the running of the limitations period until the time the injured party discovers or through the

use of reasonable care and diligence should have discovered the injury. *In a breach of contract action, limitations begin to run from the time of the breach, or from the time the plaintiff knew or should have known of the breach, whichever is the later.* El Paso Associates, Ltd. v. J.R. Thurman & Co.,* 786 S.W.2d 17, 20 (Tex.App.— El Paso 1990, no writ).

*Id.* at 837 (emphasis added); *see also El Paso Associates, Ltd. v. J.R. Thurman & Co.,* 786 S.W.2d at 20 (cause of action for breach of contact "commences to run from the time of the breach of contract, or from the time when the plaintiff had knowledge of the breach, whichever is the later, unless his lack of knowledge resulted from his lack of diligence or from negligence").

For a court to apply the discovery rule, the party asserting it must also affirmatively plead the rule. *Woods,* 769 S.W.2d at 517–18. Appellants argue that the discovery rule does not toll the statute of limitations in this case because Fields and Lightfoot failed to plead the discovery rule. After reviewing the appellees' amended and original pleadings, however, we believe Fields and Lightfoot pled sufficient facts to make the discovery rule an issue in this case.

Although appellees' original and amended pleadings do not specifically mention discovery or concealment, their second amended petition alleges that Lightfoot made no earlier demand for payment for the purchase of his shares because "he did not know and could not have known that the Control Group would not perform the agreement." As for Fields, the clear import of the appellees' pleadings is that he did not know and could not have known the Control Group's intent until Baker and Frank Davila II returned the third-call contributions and wrote that "it has become obvious that each of us will end up dealing with FIRST STATE on an individual basis." Also, the appellees specifically pled that they "justifiably relied" on the Control Group's representation that the appellants "would consummate the purchase of their respective shares of stock."

The general rule is that pleadings will be construed as favorably as possible to the pleader. *Gonzalez v. City of Harlingen,* 814

S.W.2d 109, 112 (Tex.App.—Corpus Christi 1991, writ denied). "The court will look to the pleader's intendment and the pleading will be upheld even if some element of a cause of action has not been specifically alleged. Every fact will be supplied that can reasonably be inferred from what is specifically stated." *Gulf, Colorado & Santa Fe Ry. Co. v. Bliss,* 368 S.W.2d 594, 599 (Tex. 1963). Having reviewed the appellees' pleadings and the record, we believe Fields and Lightfoot pled sufficient facts to make the discovery rule an issue in this case. We also note that appellants failed to file any special exceptions to the appellees' original or amended pleadings; hence, they waived any pleading defects. *See J.K. & Susie L. Wadley Research Inst. v. Beeson,* 835 S.W.2d 689, 695 (Tex.App.—Dallas 1992, writ denied); *see also* TEX.R.APP.P. 90.

■ Having determined that the discovery rule applies in this case, the issue then becomes whether there is sufficient evidence to support the jury's finding. As we have already noted, both Fields and Lightfoot testified that appellants could perform the agreement by paying cash or by assuming their indebtedness with First State Savings. Thereafter, Lightfoot paid the interest attributable to his retained shares; appellants paid the interest attributable to the sold shares. The trustees assured Lightfoot on several occasions that completion of the assumption was merely a matter of paperwork. Lightfoot said he believed that the appellants were attempting in good faith to work out the assumption, but that nobody at First State apprised him of any problem. Against this background, Lightfoot testified that he realized appellants were not going to perform the agreement after a meeting with Fields and his counsel on October 10, 1991.

Fields likewise testified that First State accepted his interest payments attributed to the retained shares and that appellants' ongoing assumption effort "was exactly what they said they would do." Until February 6, 1990, Fields said he believed, by virtue of the parties' reallocated contributions toward the

First State loan and appellants' ongoing assumption efforts, that appellants were in the process of performing the agreement.

The jury found that appellees, in the exercise of reasonable diligence, should have discovered on February 6, 1990 that appellants would not perform the agreement.[8] The jury charged Lightfoot with notice on that date despite his testimony as to a later date. Even so, reasonably diligent discovery is generally a matter for the jury. *Enterprise–Laredo,* 839 S.W.2d at 838. This is especially true in a case like this one, where the material facts are far from undisputed. Giving due deference to the jury's role in determining the weight and credibility of the witnesses' testimony, we believe there is sufficient evidence to support the jury's finding that February 6, 1990 was the date Fields and Lightfoot either discovered or should have discovered that the Control Group would not perform the agreement. Since there is sufficient evidence supporting the jury's finding, we need not consider the second element of *Sterner.* 767 S.W.2d at 690.

### *Judicial Admission*

■ We reach this conclusion despite the appellants' argument that both Fields and Lightfoot judicially admitted their actions accrued at a time when they would have been barred by limitations. Appellants are correct in noting that Fields and Lightfoot repeatedly testified they were entitled to payment beginning in April of 1987 with respect to Fields, and in September or October of 1986 as to Lightfoot. But, while Fields and Lightfoot both testified they were entitled to payment at the time of the contract, they also pinpointed the date when they realized the appellants were not going to perform the agreement. Lightfoot testified that he realized this for the first time on October 10, 1991; Fields testified that he reached this conclusion on February 6, 1990. We have already noted that the limitations period on a claim for breach of contract begins to run "from the time of the breach, or from the time the plaintiff knew or should have known

---

8. February 6, 1990 was the day co-trustees Baker and Frank Davila II served notice to the other members of the Control Group that "each of us will end up dealing with First State on an individual basis."

of the breach, whichever is the later." *Enterprise–Laredo,* 839 S.W.2d at 837. Without application of the discovery rule, a contract cause of action normally accrues when the contract is breached, not when it was made. *Tel–Phonic Services, Inc. v. TBS Int'l, Inc.,* 975 F.2d 1134, 1143 (5th Cir.1992).

The most that can be said of Fields' and Lightfoot's testimony regarding their entitlement to payment is that it raises a question as to when they really knew matters had gone awry. One could argue that if the appellees knew they were entitled to their money beginning in late 1986 or early 1987, they must have known long before February of 1990 that the appellants were not going to honor the agreement. This is, however, an evidentiary issue for the trier of fact, not a question of law for an appellate court; it was for the jury to determine the date appellees knew or should have known that the appellants were not going to honor their agreement. Moreover, the appellees' testimonial declarations more closely resemble "quasi-admissions," not conclusive judicial admissions:

> A party's testimonial declarations which are contrary to his position are quasi-admissions. They are merely some evidence, and they are not conclusive upon the admitter.... These are to be distinguished from the true judicial admission which is a formal waiver of proof usually found in pleadings or the stipulations of the parties. A judicial admission is conclusive upon the party making it, and it relieves the opposing party's burden of proving the admitted fact, and bars the admitting party from disputing it....

*Hennigan v. I.P. Petroleum Co., Inc.,* 858 S.W.2d 371, 372 (Tex.1993) (quoting *Mendoza v. Fidelity & Guar. Ins. Underwriters, Inc.,* 606 S.W.2d 692, 694 (Tex.1980)). "The requirements for treating a party's testimonial quasi-admission as a conclusive judicial admission include that the statement be 'deliberate, clear, and unequivocal' and that '[t]he hypothesis of mere mistake or slip of the tongue must be eliminated.'" *Id.* at 372 (quoting *Griffin v. Superior Ins. Co.,* 161 Tex. 195, 338 S.W.2d 415, 419 (1960)). Given the record in this case, we cannot say either Fields or Lightfoot judicially admitted that their claims for breach of contract were barred by limitations.

■ Nor do we attribute any significance to the fact that the plaintiffs' second amended petition pleads for a recovery of prejudgment interest beginning on October 1, 1986 for Lightfoot and April 20, 1987 for Fields. Article 5069–1.03 provides in part:

> When no specific rate of interest is agreed upon by the parties, interest at the rate of six percent per annum shall be allowed on all accounts and contracts ascertaining the sum payable, commencing on the thirtieth (30th) day from and after the time when the sum is due and payable.

TEX.REV.CIV.STAT.ANN. art. 5069–1.03 (Vernon 1987). The Texas Supreme Court has stated that "where damages are definitely determinable, interest is recoverable as a matter of right from the date of the injury or loss." *Imperial Sugar Co., Inc. v. Torrans,* 604 S.W.2d 73, 74 (Tex.1980) (per curiam). We therefore agree with appellees that there is nothing inconsistent about pleading for the commencement of interest, on the one hand, and a reasonable post-contract period of time in which appellants could timely perform the agreement, on the other.

### Law of the Case

■ Nor are we persuaded by the appellants' argument that our prior opinion in *Fields and Lightfoot v. Rouse,* No. 04–93–00067–CV (Tex.App.—San Antonio, December 15, 1993, writ denied) (unpublished), controls the outcome of this appeal. In our prior decision, which affirmed a summary judgment in favor of Dr. Richard G. Rouse, we held that all of the appellees' claims against Dr. Rouse were barred by the four-year statute of limitations for breach of contract claims. Appellants argue that our prior decision in *Fields and Lightfoot v. Rouse* controls the outcome of this case insofar as appellees' breach of contract claim is concerned. Again, however, we disagree.

The "law of the case" doctrine has been defined by the Texas Supreme Court as "that principle under which questions of law decided on appeal to a court of last resort will govern the case throughout its subsequent

stages." *Hudson v. Wakefield,* 711 S.W.2d 628, 630 (Tex.1986). By narrowing the issues in successive stages of the litigation, the law of the case doctrine attempts to achieve uniformity of decision as well as judicial economy and efficiency. *Dessommes v. Dessommes,* 543 S.W.2d 165, 169 (Tex.Civ. App.—Texarkana 1976, writ ref'd n.r.e.). The doctrine is based on public policy and is aimed at putting an end to litigation. *See Barrows v. Ezer,* 624 S.W.2d 613, 617 (Tex. Civ.App.—Houston [14th Dist.] 1981, no writ); *Elliott v. Moffett,* 165 S.W.2d 911 (Tex. Civ.App.—Texarkana 1942, writ ref'd w.o.m.).

The doctrine of the law of the case only applies to questions of law and not to questions of fact. *Hudson,* 711 S.W.2d at 630. Furthermore, the doctrine does not necessarily apply when either the issues or the facts presented at successive appeals are not substantially the same as those involved in the first trial. *Barrows,* 624 S.W.2d at 617. In *Hudson,* the court also drew a distinction between a summary judgment and an appeal following a full trial on the merits:

> A critical factor in our determination of this case is that in the first appeal we reviewed a summary judgment. On review of summary judgments, the appellate courts are limited in their considerations of issues and facts. In such a proceeding, the movant is not required to assert every theory upon which he may recover or defend. Thus, when a case comes up for a trial on the merits, the parties may be different, the pleadings may be different, and other causes of action may have been consolidated. *See Governing Bd. v. Pannill,* 659 S.W.2d 670, 680–81 (Tex.App.—Beaumont 1983, writ ref'd n.r.e.). Other distinctions may be drawn; for instance, in reviewing the evidence to determine whether there are any fact issues in dispute, the appellate court must review the evidence in the light most favorable to the party opposing the motion for summary judgment. *Gaines v. Hamman,* 163 Tex. 618, 358 S.W.2d 557, 562 (1962). Thus, the context of a summary judgment proceeding is distinguishable from a full trial on the merits.

*Id.* at 630–31. *See also Med Center Bank v. Fleetwood,* 854 S.W.2d 278, 283 (Tex.App.—Austin 1993, writ denied). The court in *Pannill* also recognized that an "appeal after a full and lengthy trial on the merits with a jury acting as the finder of facts, differs in a very material sense from a prior limited appeal" following a summary judgment. *Pannill,* 659 S.W.2d at 681.

The distinction recognized in *Hudson* and *Pannill* also applies here, since our prior opinion was issued on review of a summary judgment in favor of Dr. Rouse. The present appeal followed a jury trial which lasted nearly three weeks and leaves behind a voluminous record. As a result, the facts were developed to a point far beyond the summary judgment record that we reviewed in *Rouse.* And as we have already noted, the jury found that Fields and Lightfoot either discovered or should have discovered on February 6, 1990 that the appellants would not perform the agreement. Were we sitting as the jurors in this case we might well have resolved the issue differently. However, it was for the jury, not this court, to weigh the evidence and determine the weight and credibility of the witnesses' testimony. There is certainly sufficient evidence to support the jury's answer. Given the present circumstances, we simply cannot agree that our opinion in *Rouse* should control the legal issues in this appeal.

### Requested Limitations Issues

Appellants also argue that the trial court erred when it refused to submit their requested limitations issues. They claim the jury should have been asked when payment was due, not when Fields and Lightfoot "knew or should have known" that the appellants would not perform the agreement. Once again, we disagree.

There were four proposed limitations issues which were refused by the trial court. Two of these issues were submitted by the Davilas; the other two by Baker. As to Fields and Lightfoot, however, they were identical: (1) "On what date was the indebtedness claimed by O. Waymond Lightfoot, Jr. due to him under the terms of the agreement, if any?"; and (2) "On what date was

the indebtedness claimed by William R. Fields, Jr. due to him under the terms of the agreement, if any?"

Appellants also argue that the trial court erred in submitting questions 20 and 21 because they are not "ultimate issues." Building on their previous argument, appellants again claim the appellees' causes of action began to run at the time when they were entitled to their money. Given the appellees' testimony, this would have been on October 1, 1986 for Lightfoot and April 20, 1987 for Fields. According to appellants, it follows that a question regarding the date appellees knew, or should have known, that the Control Group would not perform the agreement is "irrelevant." Again, we disagree.

Proposed questions must be submitted to the jury in "substantially correct wording." TEX.R.CIV.P. 278. If the request is not in substantially correct wording, it does not preserve error. TEX.R.CIV.P. 279; *Keetch v. Kroger Co.*, 845 S.W.2d 262, 266 (Tex.1992). In this case, the appellants' proposed limitations questions were not tendered in "substantially correct" wording. For example, their tendered questions assumed that the contract specified when payment would be due—it did not. Appellants apparently presume that the limitations period for breach of contract claims is measured only from the time payment is due—it is not. Nor can appellees' testimony regarding when they were entitled to their money be transformed into conclusive judicial admissions, given the strict standards which govern judicial admissions. To be within the realm of substantial correctness, the appellants' tendered limitations questions should have included a reasonable time inquiry—once again, they did not. Since the appellants failed to comply with Rule 279, their limitations points concerning the charge are not subject to appellate review. There was no abuse of discretion.

As to whether questions 20 and 21 raised "ultimate issues," we note that the trial court has broad discretion when constructing the jury charge. "A proper broad form jury question asks an ultimate issue and instructs the jury about the elements of the ground of recovery or defense that the jury must find

before giving a 'yes' answer to the issue." *Rampel v. Wascher*, 845 S.W.2d 918, 924 (Tex.App.—San Antonio 1992, writ denied). We hold that the charge in this case aided the jury and did not misstate the law. Appellants' points are overruled.

### Breach of Contract

Fields and Lightfoot pleaded that Lieb's May 19, 1987 letter evidenced a contract binding on the appellants for the purchase of the appellees' stock. This claim was submitted to the jury in questions one and two of the court's charge. In answering these questions, the jury agreed that Lieb's May 19, 1987 "writings" "constituted an agreement whereby the Control Group" purchased Fields' and Lightfoot's stock. The questions were preceded by an "Instruction on Agreement," which charged the jury as follows:

> In deciding whether the parties agreed that Lightfoot and Fields would not be paid unless First State Savings actually funded and restructured the Control Group's loans, you may consider what the parties said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

In addition to arguing that the appellees' contract claim is barred by limitations, appellants assail the breach of contract theory on a number of other grounds: (1) the trial court should have admitted evidence that the agreement was conditioned on First State "actually funding" the stock purchase; (2) the trial court should have asked the jury whether the agreement was "conditioned" on financing; (3) the jury's finding that the Control Group ratified its purchase of the appellees' stock is not supported by legally or factually sufficient evidence; (4) the trial court should have asked the jury whether each of the appellants individually ratified the agreement; (5) the appellees' contractual damages are not supported by legally or factually sufficient evidence; (6) the trial court should have submitted questions asking the jury whether each member of the Control Group individually agreed to purchase the appellees' stock and whether the agree-

ment was based upon prorata liability; and (7) the trial court should not have held them jointly and severally liable for the appellees' contractual damages.

### Exclusion of Evidence

Prominent among appellants' complaints is their contention the trial court erred in not submitting to the jury their theory concerning the non-occurrence of an alleged condition precedent, i.e., the agreement was conditioned on First State "actually funding" the stock purchase. This argument takes two forms: (1) that the trial court erred in failing to admit evidence that the agreement was conditioned on First State actually funding or restructuring the Control Group's loans; and (2) that the trial court should have submitted a separate question regarding conditional purchase in the court's charge. We will begin with the first argument, which concerns the parol evidence rule and the trial court's ruling on the appellees' motion in limine.

On February 22, 1993, shortly before trial, the appellees filed a motion in limine. Although there is no written order, the record indicates that the trial court sustained paragraph eight of the motion, which asked the court to prohibit the appellants or their counsel from suggesting to the jury,

> that there were conditions, conditions precedent or terms of their agreement to purchase Appellees' shares of Crown Bancshares stock which are not expressed in the written memoranda, letters and records of Crown and the Control Group, because such writings constitute the written agreements between the parties; and Appellants cannot vary the terms by parol evidence and have no pleadings to support introduction of such testimony.

Appellants introduced evidence through a bill of exception pertaining to the alleged condition precedent. Baker and Frank Davila II testified by bill of exception that the agreement made by the members of the Control Group was subject to the condition that First State Savings would provide refinancing. The appellants' bill included excerpts from the depositions of Frank Cross and Dwight Lieb, both of whom similarly testified

that refinancing by First State Savings was part of the agreement.

The bill also included testimony from Frank Davila II regarding plaintiffs' exhibits 16 and 59. Exhibit 16 was the notice from Frank Davila II to members of the Control Group informing them of a meeting to be held on June 16, 1986 to consider repurchase of the appellees' stock. Exhibit 59 was Frank Davila II's February 22, 1988 memorandum which questioned the validity of the sale and reiterated that any purchase was based on financing from First State. Both documents had been admitted at the beginning of trial without limitation, but during Frank Davila II's direct examination, the trial judge would not permit him to read aloud the first paragraph of exhibit 59, which stated that "an effective transaction concerning the sale or transfer of the stock would involve, among other things, the approval of First State Savings to finance the purchase of said stock." This was presumably in keeping with the court's ruling on the motion in limine. During the bill of exception, Frank Davila II read from both the excluded portion of exhibit 59 and the first paragraph of exhibit 16, which stated "[t]he control group purchase would be conditioned on the approval of First State Savings to finance the purchase."

Lightfoot testified under direct examination during the appellants' bill of exception that the original proposal presented to the Control Group was that he would be paid $10 per share for 25,000 shares; that the Control Group agreed to purchase his shares at that price based upon the "approval" or "permission" of First State Savings to refinance the debt. Lightfoot also admitted that his original petition contained the statement that "[t]he purchase [of Lightfoot's shares] was conditioned on the Control Group's acquisition of financing from FIRST STATE." The appellants' record included a copy of Lightfoot's original petition, which the trial court had excluded from evidence.

The parol evidence rule is a rule of substantive law which provides that in the absence of fraud, accident, or mistake, extrinsic evidence is not admissible to vary, add to, or contradict the terms of a written instrument

that is facially complete and unambiguous. *Martin v. Ford,* 853 S.W.2d 680, 681 (Tex. App.—Texarkana 1993, writ denied); *see also* JOHN D. CALAMARI AND JOSEPH M. PERILLO, CONTRACTS § 3–2, at 135–36 (3rd ed. 1987) ("The parol evidence rule has been stated in many ways but the basic notion is that a writing intended by the parties to be a final embodiment of their agreement may not be contradicted by certain kinds of evidence.").

A party may not introduce parol evidence to vary the terms of an unambiguous contract. *Murphy v. Dilworth,* 137 Tex. 32, 151 S.W.2d 1004, 1005 (1941); *Markert v. Williams,* 874 S.W.2d 353, 355 (Tex.App.—Houston [1st Dist.] 1994, writ denied). When a writing is intended as a completed legal transaction, the parol evidence rule excludes other evidence of any prior or contemporaneous expressions of the parties relating to the transaction. *Markert,* 874 S.W.2d at 355; *Massey v. Massey,* 807 S.W.2d 391, 405 (Tex.App.—Houston [1st Dist.] 1991), *writ denied,* 867 S.W.2d 766 (Tex.1993). Only if the intention of the parties as expressed on the face of the document is doubtful may the court resort to parol evidence to resolve the doubt. *Markert,* 874 S.W.2d at 355.

■ When there is no ambiguity, parol evidence is not admissible to create one. *Markert,* 874 S.W.2d at 355; *Entzminger v. Provident Life & Accident Ins. Co.,* 652 S.W.2d 533, 537 (Tex.App.—Houston [1st Dist.] 1983, no writ); *see also Sun Oil Co. (Delaware) v. Madeley,* 626 S.W.2d 726, 731 (Tex.1981) (When a contract, on its face, can be given a definite, legal meaning, parol evidence is not admissible to render it ambiguous). Only after the trial judge determines that the contract is ambiguous does parol evidence become admissible, and then only to assist the fact finder in determining the subjective intent of the parties at the time they entered into the agreement. *Coker v. Coker,* 650 S.W.2d 391, 394 (Tex.1983).

■ Even in the absence of appropriate pleading by either party, a trial judge may conclude a contract is ambiguous. *Sage Street Associates v. Northdale Const. Co.,* 863 S.W.2d 438, 445 (Tex.1993). Indeed, he must do so before the issue can be submitted to the jury:

If the trial court has not made a determination on the question of whether a contract is ambiguous before a jury trial commences, it is incumbent on the judge when it first becomes apparent during trial that at least one of the parties is claiming ambiguity, supported by adequate pleadings, to examine the provisions in question and determine at that time whether or not the contract is or is not ambiguous. This is necessary, among other reasons, so that the court can properly rule on evidentiary objections and submit a substantially correct charge.

*West Texas Gathering Co. v. Exxon Corp.,* 837 S.W.2d 764, 770 (Tex.App.—El Paso 1992), *rev'd on other grounds,* 868 S.W.2d 299 (Tex.1993). If neither party alleges a contract is ambiguous, or if the issue is raised for the first time on appeal, construction of the agreement is a question of law for the appellate court. *See Praeger v. Wilson,* 721 S.W.2d 597, 600 (Tex.App.—Fort Worth 1986, writ ref'd n.r.e.); *see also Community Dev. Serv. v. Replacement Parts Mfg., Inc.,* 679 S.W.2d 721, 724 (Tex.App.—Houston [1st Dist.] 1984, no writ); *Sale v. Contran Corp.,* 486 S.W.2d 161, 165 (Tex.Civ.App.—Dallas 1972, writ ref'd n.r.e.).

Although never using the word "ambiguity" in their pleadings, the appellants and appellees obviously disagreed over whether there was a contract, and if so, whether it was subject to certain conditions. Baker and the Davilas alleged in their amended answers that "[t]here was no valid agreement between Appellants and/or the Control Group and Appellees because there was no meeting of the minds of the parties as to such agreement." Pitman, Bertino, O'Connor, and Manning all denied that Lieb, Baker or Frank Davila II—the voting trustees—ever had the authority to negotiate an agreement with the appellees, or that they ratified such an agreement, but added that if there were an agreement, it was subject to certain conditions precedent, e.g., First State Savings agreeing to the proposed transfer of stock, allowing a prorata assumption of the appellees' debts, and, in turn, releasing the appellees from their indebtedness. Haass adopted the amended answers filed by Fred Baker

and the Davilas, which contained these same allegations.

There is no indication in the record that the trial court ever expressly found the contract was ambiguous, and apparently, none of the parties ever asked him to do so. The trial judge must have concluded, at least initially, that Lieb's letter was unambiguous, since it excluded the appellants' condition evidence. In constructing the jury charge, however, the trial judge asked the jury questions designed to ascertain whether there was an agreement, i.e., whether Lieb's May 19, 1987 "writings" "constituted an agreement whereby the Control Group" purchased Fields' and Lightfoot's stock. If the document was indeed unambiguous, the court should never have submitted such issues to the jury. Only when a contract contains an ambiguity does its interpretation become a question of fact for the jury. *Reilly v. Rangers Management, Inc.,* 727 S.W.2d 527, 529 (Tex.1987). While the trial judge never expressly found the agreement was ambiguous, such a determination was necessary before it could submit questions one and two. *See Exxon Corp. v. West Texas Gathering Co.,* 868 S.W.2d 299, 302 (Tex.1993) ("If the court had not considered the contract ambiguous, the court could only have interpreted it as a matter of law."); *see also Neece v. A.A.A. Realty Co.,* 159 Tex. 403, 322 S.W.2d 597, 599 (1959) (By submitting issues to the jury designed to ascertain the parties' agreement, "the trial judge evidently considered that the written instrument was ambiguous."). As a result, the issue is whether the trial court erred in concluding the document was ambiguous, and if not, whether the appellants' parol evidence should have been admitted.

■■■ In construing a contract, the court must give effect to the objective intent of the parties as expressed or apparent in the writing, in light of the surrounding circumstances. *Praeger,* 721 S.W.2d at 600–01. A contract is not ambiguous if, after applying the rules of construction, the provision in question can be given a certain or definite legal meaning or interpretation. *Coker,* 650 S.W.2d at 393; *Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154, 158 (1951). On the other hand, the contract is

ambiguous when its meaning is uncertain and doubtful or it is reasonably susceptible to more than one meaning. *Coker,* 650 S.W.2d at 393. We recognize that an instrument is not ambiguous simply because the parties disagree over its interpretation. *Markert,* 874 S.W.2d at 355; *Praeger,* 721 S.W.2d at 600. After carefully reviewing the record, we do not believe the trial judge erred in concluding the agreement was ambiguous or in submitting the issue to the jury.

Turning to the second issue, we note that parol evidence is admissible regarding the intentions of the parties when the writing contained in the document is ambiguous. *Trinity Universal Ins. Co. v. Ponsford Bros.,* 423 S.W.2d 571, 574–75 (Tex.1968). Moreover, it is admissible to show the agreement was not to become effective save upon certain conditions or contingencies. *Baker v. Baker,* 143 Tex. 191, 183 S.W.2d 724, 728 (1944); *Litton v. Hanley,* 823 S.W.2d 428, 430 (Tex.App.—Texarkana 1992, no writ). Since the trial court concluded the agreement was ambiguous, and since our review of the record and the law requires no contrary determination, the appellants' parol evidence should have been admitted to aid the jury in determining the intentions of the parties.

■■■ Our analysis, however, does not end there. We must also conduct a harm analysis to determine if this error requires reversal. *See* Tex.R.App.P. 81(b)(1). In addition to showing that the trial court committed error, appellants must also show that the error was reasonably calculated to cause and probably did cause the rendition of an improper verdict. *Gee v. Liberty Mut. Fire Ins. Co.,* 765 S.W.2d 394, 396 (Tex.1989); *Bridges v. City of Richardson,* 163 Tex. 292, 354 S.W.2d 366, 368 (1962); *New Braunfels Factory Outlet Center, Inc. v. IHOP Realty Corp.,* 872 S.W.2d 303, 310 (Tex.App.—Austin 1994, no writ); *see also* Tex.R.App.P. 81(b). The admission or exclusion of evidence rests within the sound discretion of the trial court. *Center, Inc.,* 872 S.W.2d at 310; *Tracy v. Annie's Attic, Inc.,* 840 S.W.2d 527, 531 (Tex.App.—Tyler 1992, writ denied); *Luvual v. Henke & Pillot,* 366 S.W.2d 831, 838 (Tex.Civ.App.—Houston [1st Dist.] 1963, writ ref'd n.r.e.). In other words, the trial court

commits error only when it acts in an unreasonable and arbitrary manner, or acts without reference to any guiding principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). Reversible error does not usually occur in connection with rulings on questions of evidence unless the appellant can demonstrate that the whole case turns on the particular evidence that was admitted or excluded. *Litton v. Hanley,* 823 S.W.2d 428, 430 (Tex.App.—Houston [1st Dist.] 1992, no writ). The exclusion of evidence is harmless if it is cumulative of other evidence that was admitted on the same issue. *See Gee,* 765 S.W.2d at 396 ("The erroneous admission of testimony that is merely cumulative of properly admitted testimony is harmless error."); *see also* Tex.R.Civ.Evid. 403.

■ Appellants argue that exclusion of their condition evidence was harmful error, because it was material not only to the issue of whether there was an agreement, but to all of the appellees' tort claims as well as their actual and exemplary damages. Unable to elicit testimony from witnesses, produce documentary evidence, or argue to the jury what the terms of the agreement were, and consequently, explain why they did not follow through with the deal, appellants claim their case was hopelessly prejudiced by the trial court's decision to exclude their condition precedent testimony. We disagree.

Our review of the record shows that various Control Group members testified without objection that it was their intention to purchase the appellees' stock only if First State would finance the purchase. Although never using the word "condition," Baker, Lieb, Pitman, O'Connor, Bertino, Manning, and Haass all testified before the jury that they were prepared to buy their prorata shares of Fields' and Lightfoot's stock if First State agreed to refinance the purchase. Moreover, the issue of financing conditions was raised during closing arguments. Counsel for Baker and the Davilas urged the jury to answer "no" to questions one and two because the financing condition had not been satisfied. Thus, not only did the jury hear a wealth of evidence on the appellants' condition theory,

but the issue was included in the court's preliminary "Instruction on Agreement" and argued to the jury. Appellants never objected to this instruction. As for plaintiffs' exhibits 16 and 59, the Frank Davila II memoranda, although appellants claim they were never offered to the jury "in their entirety," the record shows both documents were admitted without reservation at the beginning of trial, and were in the jury room during deliberations. The fact Frank Davila II was not permitted to read from or testify regarding specific paragraphs is not cause for concern, when one considers the other condition evidence that was before the jury. Because other evidence admitted throughout the trial and emphasized during closing arguments conveyed substantially the same information to the jury that was found in appellants' bill of exception, even if the trial court erred in excluding this testimony, the error was harmless. The appellants' points are overruled.

### *Conditional Purchase*

■ Appellants also argue that the trial court erred in refusing to ask the jury whether the agreement was conditioned on financing by First State. To prevail on these points, however, appellants must show they were entitled to a jury question on the issue. All parties are entitled to have controlling issues, raised by the pleadings and evidence, submitted to the jury. *Brown v. Goldstein,* 685 S.W.2d 640, 641 (Tex.1985). A controlling issue is one which requires a factual determination to render judgment in the case. *Employers Casualty Co. v. Block,* 744 S.W.2d 940, 944 (Tex.1988) (op. on reh'g). The issue must also be disputed. *Id.*

■ Appellants must also show they preserved error to prevail on these points. Several procedural steps are required to preserve error. First, the complaining party must request a question on the issue. *Lyles v. Texas Employers' Ins. Ass'n,* 405 S.W.2d 725, 727 (Tex.Civ.App.—Waco 1966, writ ref'd n.r.e.). The request must be in writing, separated from other requested jury charges, and must be tendered in "substantially correct" form. Tex.R.Civ.P. 278, 279; *Woods v. Crane Carrier Co., Inc.,* 693 S.W.2d 377, 379

(Tex.1985). The requested question must also be presented and filed before the charge is read to the jury. *M.L.C. Loan Corp. v. P.K. Foods, Inc.*, 541 S.W.2d 902, 905 (Tex. Civ.App.—Beaumont 1976, no writ). Finally, the complaining party must obtain a ruling on the request. TEX.R.CIV.P. 276; *Greenstein, Logan & Co. v. Burgess Mktg.*, 744 S.W.2d 170, 181 (Tex.App.—Waco 1987, writ denied).

Counsel for Baker, Haass, Bertino, Pitman, O'Connor and the Davilas all objected to questions one and two, but only the Davilas tendered "condition" questions. The Davilas' first question asked whether there "was any authority given to Lieb by the Davila Defendants to purchase Fields' stock limited to purchasing such stock on condition of First State actually accomplishing the financing?" The second question asked: "Did the Davila Defendants agree to by [sic] Fields' stock without a condition of First State actually accomplishing the financing?" The third asked: "Did the Davilas agree to buy Crown Bancshares, Inc. from Lightfoot without a condition of First State actually accomplishing the financing?" All three questions were refused by the trial court. The record shows that appellants filed written requests for a special charge on the issue of condition, separated from their other requested questions, definitions, and instructions, before the charge was submitted to the jury. Therefore, they complied with the first procedural step in error preservation. Because the trial judge endorsed these requests "refused" and signed his name officially, appellants fulfilled this final error preservation requirement.

We review a trial court's submission of a theory of recovery or defense by questions or instructions under an abuse of discretion standard, recognizing there is a presumption in favor of the broad-form submission of questions. TEX.R.CIV.P. 277; *Texas Dept. of Human Services v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990); *Mobil Chem. Co. v. Bell*, 517 S.W.2d 245, 256 (Tex.1974). "Rule 277 mandates broad form submission 'whenever feasible,' that is, in any and every instance in which it is capable of being accomplished." *E.B.*, 802 S.W.2d at 649. The test for an abuse of discretion is whether the trial court's action in refusing to submit the requested definition and instruction was arbitrary or unreasonable. *Downer*, 701 S.W.2d at 241–42. This means the trial court has wide discretion in submitting explanatory instructions and definitions, *Wisenbarger v. Gonzales Warm Springs Rehabilitation Hosp., Inc.*, 789 S.W.2d 688, 692 (Tex.App.—Corpus Christi 1990, writ denied), or in determining what constitutes necessary and proper issues. *Scott v. Ingle Bros. Pacific, Inc.*, 489 S.W.2d 554, 557 (Tex.1972).

Instructions and definitions are proper when they are raised by the written pleadings, supported by the evidence, and aid the jury in answering the questions in the charge. *See* TEX.R.CIV.P. 277, 278; *see also Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992); *Texas Dep't of Transp. v. Ramming*, 861 S.W.2d 460, 463 (Tex.App.—Houston [14th Dist.] 1993, writ denied) (trial court's discretion "is subject to the requirement that the questions submitted must control the disposition of the case, be raised by the pleadings and evidence, and properly submit the disputed issues for the jury's deliberation."). But, "[a] judgment should not be reversed because of a failure to submit other and various phases or different shades of the same question." *Sheldon L. Pollack Corp. v. Falcon Industries, Inc.*, 794 S.W.2d 380, 383 (Tex.App.—Corpus Christi 1990, writ denied). Moreover, a trial court errs if it refuses to submit a properly formed question with appropriate instructions, and instead submits separate, granulated issues to the jury. *H.E. Butt Grocery Co. v. Warner*, 845 S.W.2d 258, 260 (Tex.1992).

In *Island Recreational Development Corp. v. Republic of Texas Savings Association*, 710 S.W.2d 551 (Tex.1986), the developer and owner of a condominium brought a lawsuit against a bank alleging breach of contract for failure to permanently fund first mortgages of condominium units under the terms of a commitment letter. *Id.* at 553. The trial court submitted a broad-form issue to the jury asking whether they found the "plaintiffs performed their obligations under the commitment letter in question." *Id.* at 554. There were no instructions accompanying this issue, nor did the parties ask for them.

*Id.* The Texas Supreme Court held that trial courts are permitted, and even urged, to submit the controlling issues of a case in broad terms so as to simplify the jury's chore. *Id.* at 555. The *Island* Court further held, and Rule 277 specifically provides, that the trial court should submit appropriate accompanying instructions to enable the jury to render a verdict. *Id. See also Glendon Investments, Inc. v. Brooks,* 748 S.W.2d 465, 469 (Tex.App.—Houston [1st Dist.] 1988, writ denied); *American Cyanamid Co. v. Frankson,* 732 S.W.2d 648, 658 (Tex.App.—Corpus Christi 1987, writ ref'd n.r.e.).

In the present case, as in *Island,* Fields' and Lightfoot's contractual claim was submitted to the jury in broad form. Although appellants claim the trial court should have submitted several additional questions inquiring about specific aspects of the contract—whether the agreement was conditioned; whether the appellants individually ratified it—the controlling issue in the case, and the one which authorized recovery for the appellees, was whether Lieb's May 19, 1987 letter constituted an agreement whereby the Control Group bought certain shares of Fields' and Lightfoot's stock. This was the issue the trial court submitted to the jury; the remaining issues, e.g., condition and ratification, were addressed in the court's accompanying instructions and, therefore, were encompassed within the broad-form question. We therefore hold that the trial court did not abuse its discretion in refusing appellants' tendered questions and in choosing to submit the contractual claims in broad form. Accordingly, appellants' points of error are overruled.

### Agency

In connection with the liability issues, the court gave the jury an "Instruction on Authority" which preceded all of the liability questions:

> A party's conduct includes the conduct of another who acts with the party's authority or apparent authority.

> Authority for another to act for a party must arise from the party's agreement that the other act on behalf and for the benefit of the party. If a party so authorizes another person to perform an act, that other party is also authorized to do whatever else is proper, usual and necessary to perform the act expressly authorized.

> Apparent authority exists if a party (1) knowingly permits another to hold himself out as having authority or, (2) through lack of ordinary care, bestows on another such indications of authority that lead a reasonably prudent person to rely on the apparent existence of such authority to his detriment. Only the acts of the party sought to be charged with responsibility for the conduct of another may be considered in determining whether apparent authority exists.

During closing arguments, appellants urged the jury to absolve them of liability because they gave Lieb no authority to purchase the appellees' stock. In resolving the liability issues against the appellants, however, the jury impliedly found the requisite agency connection.

Appellants raised no trial objection to the court's agency instruction, and their briefs scarcely even mention the issue. In a reply brief, Baker argues the trial court should not have rendered judgment based upon a theory of agency because the trial court's rulings construing Lieb's May 19, 1987 letter as the written memorial of the agreement between the parties and its prohibition of the appellants' condition evidence harmed appellants. Moreover, Baker again claims the trial court erred in refusing the appellants' condition evidence because this evidence would have explained "Lieb's restricted authority."

■ Conspicuously absent from the appellants' argument is any indication of whether, or how, they preserved error on this point. Any complaint concerning the submission of an instruction is waived unless specifically included in the objections. *See* Tex.R.Civ.P. 274. This appellants failed to do. Although they tendered several proposed instructions on agency, appellants never once challenged the court's agency in-

struction, nor do they raise the issue now.[9] By failing to even raise the issue in their appellate briefs, appellants waived any complaint on appeal regarding an implied finding of agency.

■ But even if error was preserved, we believe there is sufficient evidence for the jury to have reasonably inferred the existence of an actual or apparent agency relationship between Trustee Lieb and the other members of the Control Group regarding the purchase of Fields' and Lightfoot's stock. Whether an agency relationship exists is usually a question of fact, and circumstantial evidence may be used to establish the agency and the extent of the agent's authority. *St. Paul Surplus Lines Ins. Co., Inc. v. Dal-Worth Tank Co., Inc.,* 917 S.W.2d 29, 48 (Tex.App.—Amarillo 1995, n.w.h.); *Bhalli v. Methodist Hosp.,* 896 S.W.2d 207, 210 (Tex. App.—Houston.[1st Dist.] 1995, writ denied); *Foundation Reserve Ins. Co. v. Wesson,* 447 S.W.2d 436, 438 (Tex.Civ.App.—Dallas 1969, writ ref'd). An agency relationship becomes a question of law only when the facts are agreed or undisputed. *Ross v. Texas One Partnership,* 796 S.W.2d 206, 209 (Tex. App.—Dallas 1990), *writ denied per curiam,* 806 S.W.2d 222 (Tex.1991). This is certainly not such a case.

### The Voting Trust Agreement

Perhaps the most compelling evidence of an agency relationship between Lieb and the members of the Control Group is the voting trust agreement. In entering this agreement, the appellants agreed among themselves, in the interest of "continuity and stability of policy," to unite their vote in Trustee Lieb and to be bound by their own vote regarding matters entrusted to him. This agreement constitutes evidence, albeit cir-

cumstantial, from which the jury could have found a broader agency relationship between Lieb and the other members of the Control Group.

### Other Circumstantial Evidence

There is also evidence of an actual or apparent agency relationship through the Control Group's official vote and the appellants' subsequent conduct. Among the relevant circumstances the jury could have considered is the fact that, after receipt of Lieb's May 19, 1987 letter, each appellant appears to have conducted himself in accordance with the described transaction. There is evidence in this record from which the jury could have found that each appellant had knowledge of the transaction, recognized its existence, and retained the beneficial right to increase his holdings commensurate with the purchase. Not only did the Control Group vote its explicit ratification, but each appellant contributed several times to the Control Group's fund for paying the First State debt that corresponded to the stock purchase. Given these circumstances, we believe there is sufficient evidence to support the jury's implied finding that Lieb was the agent of the Control Group. *See City of San Antonio v. Aguilar,* 670 S.W.2d 681, 683 (Tex.App.—San Antonio 1984, writ dism'd) (implied authority exists when appearances indicate that "in some manner the agent was authorized to do what he did").

### Ratification

In addition to the agency instruction, the court also charged the jury on ratification. In answering this question, the jury found that the Control Group ratified their purchase of Fields' and Lightfoot's stock.[10] Ap-

---

**9.** Counsel for the Davilas alluded to the issue of agency when he was objecting to questions one and two of the court's charge. After reminding the trial judge that questions one and two asked the jury to determine whether Lieb was an agent for the Control Group, counsel added: "We have submitted requested instructions on the—on agency, and this is a necessary element of whether Mr. Lieb was an agent and could enter into the agreement. And we have submitted an instruction on that agency theory which we've raised by the pleadings and has been shown by the evidence or raised by the evidence, and the

court has denied that." On appeal, however, appellants do not challenge the trial court's denial of their agency instructions.

**10.** Question three reads as follows:

Do you find the Control Group ratified their purchase of Fields' stock?
[Answer "Yes" or "No"]
ANSWER: Yes
Question four provided:
Do you find the Control Group ratified their purchase of Lightfoot's stock?

pellants raise two related arguments regarding the court's ratification instruction and the jury's findings: (1) they claim the court's submission of the issue was erroneous because appellants were entitled to separate questions as to whether each of them, individually, ratified the Lieb agreement; and (2) they argue that even if the ratification issue was properly submitted, the evidence is both legally and factually insufficient to support the jury's response. After reviewing the record, however, we disagree.

When, as in this case, both legal and factual sufficiency points are raised, we must first examine the legal sufficiency of the evidence. *Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex.1981). In considering a "no evidence" or legal sufficiency point, we consider only the evidence or inferences from the evidence favorable to the decision of the trier of fact and disregard all evidence and inferences to the contrary. *Sherman v. First Nat'l. Bank*, 760 S.W.2d 240, 242 (Tex. 1988); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). If there is any evidence—more than a scintilla—to support the finding, the no evidence challenge will fail. *Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex.1987); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

In considering a factual sufficiency point, we may not substitute our judgment for that of the trier of fact, but must assess all the evidence and reverse for a new trial only if the challenged finding shocks the conscience, clearly demonstrates bias, or is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). Under this analysis, we are not the fact finders and we do not pass upon the credibility of witnesses or substitute our judgment for that of the trier of fact, even if there is conflicting evidence upon which a

different conclusion could be supported. *Clancy v. Zale Corp.*, 705 S.W.2d 820, 826 (Tex.App.—Dallas 1986, writ ref'd n.r.e.). In other words, we are not free to substitute our judgment for the jury's simply because we may disagree with the verdict. *Herbert v. Herbert*, 754 S.W.2d 141, 142 (Tex.1988).

 Ratification occurs when a principal, though he had no knowledge originally of an unauthorized act of his agent, retains the benefits of the transaction after acquiring full knowledge. *Land Title Co. of Dallas, Inc. v. F.M. Stigler, Inc.*, 609 S.W.2d 754, 757 (Tex. 1980). Stated simply, if a person who has fraudulently been made a party to a contract continues to receive the benefits of the contract after he becomes aware of the fraud, or if he otherwise conducts himself in such a manner as to recognize the contract as existing and binding, he thereby affirms the contract and waives his right to a rescission. *Daniel v. Goesl*, 161 Tex. 490, 341 S.W.2d 892, 895 (1960); *Rosenbaum v. Texas Bldg. & Mortgage Co.*, 140 Tex. 325, 167 S.W.2d 506, 508 (1943); *Spangler v. Jones*, 797 S.W.2d 125, 131 (Tex.App.—Dallas 1990, writ denied). An express ratification is not necessary; any act based upon a recognition of the contract as existing or any conduct inconsistent with an intention of avoiding it has the effect of waiving the right of rescission. *Rosenbaum*, 167 S.W.2d at 508. The critical factor in determining whether a principal has ratified an unauthorized act by his agent is the principal's knowledge of the facts of the prior transaction and his actions in light of such knowledge. *Land Title Co. v. F.M. Stigler, Inc.*, 609 S.W.2d 754, 756 (Tex.1980). Ratification can occur if the party, at the time of his allegedly ratifying acts, has knowledge of all material facts pertaining to the prior fraudulent transaction. *Rourke v. Garza*, 530 S.W.2d 794, 805 (Tex.1975); *Vessels v. Anschutz Corp.*, 823 S.W.2d 762, 764

[Answer "Yes" or "No"]
ANSWER: Yes
These questions were preceded by an instruction on ratification:
 A party's conduct includes conduct of others that the party has ratified. Ratification may be express or implied.
 Implied ratification occurs when a party, though he may have been unaware of unau-

thorized conduct taken on his behalf at the time it occurred, retains the benefits of the transaction involving the unauthorized conduct after he acquired full knowledge of the unauthorized conduct. Implied ratification results in the ratification of the entire transaction.

(Tex.App.—Texarkana 1992, writ denied). The question of ratification of a contract is usually a mixed question of law and fact. *Sawyer v. Pierce,* 580 S.W.2d 117, 123 (Tex. Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.). Although ratification may be determined as a matter of law if the evidence is uncontroverted or uncontrovertible, when the act or acts of ratification are controverted, the question of ratification must be left to the trier of fact. *Id.*

▮ Appellants argue that Plaintiff's Exhibit 66—the handwritten minutes of the Control Group's March 16, 1988 meeting—do not show who voted for the resolution to confirm the purchase of Fields' and Lightfoot's stock. Rather, these minutes, which were kept by Pitman, merely indicate that the "[m]otion to confirm that the stock purchase is a valid transaction made 2nded & [sic] passed." Baker, like the other appellants, testified that if the minutes meant the agreement was being ratified without any condition, he did not vote for it. And Baker, like the other appellants, testified by bill of exception that the agreement was always conditioned on First State accomplishing financing.

Be that as it may, however, the record is replete with evidence from which the jury could have concluded the Control Group ratified the purchase of Fields' and Lightfoot's shares. "It is fundamental that the critical factors in determining ratification are 1) the principal's subsequent knowledge of the transaction and 2) his actions thereafter, *and implied ratification may be proven by silence in the face of knowledge." See Banc-TEXAS Allen Parkway v. Allied American Bank,* 694 S.W.2d 179, 182 (Tex.App.—Houston [14th Dist.] 1985, no writ) (emphasis added); *see also Spangler,* 797 S.W.2d at 131 (conduct recognizing agreement as binding is sufficient). There is evidence that each appellant had knowledge of the transaction,

conducted himself in recognition of its existence, and retained the beneficial right to increase his holdings commensurate with a stock purchase. Indeed, not only did the Control Group vote its explicit ratification of the stock purchase, but each appellant contributed several times to the Control Group's fund to pay the First State debt that corresponded to the purchase. Given this record, there is simply no merit to the appellants' contentions that the trial court erred when it refused to submit separate authority and ratification questions for each defendant. In entering the voting trust agreement, the appellants agreed among themselves, in the interest of "continuity and stability of policy," to unite their vote in Trustee Lieb and to be bound by their own vote in matters entrusted to him. Moreover, each appellant's contribution to partial performance is additional evidence from which the jury could have concluded they acknowledged Lieb's authority and ratified the stock purchase agreement with Fields and Lightfoot. Finally, the trial court's Control Group questions are all-or-nothing propositions; the jury could not have answered as it did without a finding applicable to every member of the Control Group. Thus, even if Lieb did not have the authority to negotiate a stock purchase agreement with the appellees, the jury's finding that the Control Group ratified the purchase of the appellees' shares supports the trial court's judgment. We therefore hold that the trial court did not err in refusing to submit separate ratification questions, and the jury's finding that the Control Group ratified the purchase of the appellees' shares is supported by legally and factually sufficient evidence.

### *Damages for Breach of Contract*

Appellants also attack the legal and factual sufficiency of the evidence supporting the appellees' contractual damages—questions five and six of the court's charge.[11] Urging

---

11. The questions and the jury's answers are as follows:

> What sum of money, if any, if paid in cash, would fairly and reasonably compensate Lightfoot for his damages, if any, that resulted from the Control Group's failure to comply with their agreement to purchase 25,000 of his shares?

> Consider the following elements of damages, if any, and none other:
> a. The agreed purchase price;
> b. The reasonable and necessary costs incurred by Lightfoot;
> c. Reasonable and necessary expenses incurred in defense of the suit brought on Lightfoot's loan at First State Savings;

an evidentiary sufficiency challenge as to various elements of Fields' and Lightfoot's contractual damages, appellants argue the entire answer should be disregarded. The Davilas, for example, claim two elements of Fields' contractual damages lack any support in the evidence: (b) reasonable and necessary costs incurred by Fields, and (e) the value of any property, income or business interests lost as a natural, probable and foreseeable consequence of the Control Group's failure to comply. Baker argues that "[t]here is no evidence that as a natural, probable and foreseeable consequence of group's [sic] purported failure to comply with the agreement that Fields lost the value of any property, income or business interests," an apparent reference to element (e) of question number six. As for Lightfoot, appellants claim there is no evidence of damage to Lightfoot's credit reputation and the "reasonable and necessary costs incurred."

■ Our review of the appellees' contractual damages is complicated by the fact that the issues were submitted to the jury in broad form, i.e., called for a one-sum answer after consideration of several different elements. "[W]hen a damages issue is submitted in broad-form, an appellate court cannot ascertain what amount of the damages award

is attributable to each element." *Greater Houston Transp. Co., Inc. v. Zrubeck*, 850 S.W.2d 579, 589, n. 11 (Tex.App.—Corpus Christi 1993, writ denied).

The only way that a defendant can successfully attack a multi-element damages award on appeal is to address each and every element and show that not a single element is supported by sufficient evidence. If there is just one element that is supported by the evidence, the damages award will be affirmed if it is supported by the evidence.

*Id.* Appellants have clearly failed to meet this burden.

Appellants cannot defeat a damages question that is submitted in broad-form by attacking only individual elements. We note, for example, that the Davilas fail to challenge three elements of Fields' damages: (a) the agreed purchase price; (c) reasonable and necessary costs incurred in defense of the suit brought on Fields' loan at First State Savings; and, more importantly, (d) damage to credit reputation that was a natural and probable and foreseeable consequence of the Control Group's failure to comply. Baker fails to challenge the evidence in support of element (d)—damage to Fields' credit repu-

---

d. Damage to credit reputation that was a natural, probable and foreseeable consequence of the Control Group's failure to comply.
Do not include any amount for interest on past damages, if any.
Answer in dollars and cents for damages, if any, that—
　Were sustained in the past:
ANSWER: $253,000
　In reasonable probability will be sustained in the future:
ANSWER: $0
A similar question was posed with respect to Fields:
　What sum of money, if any, if paid in cash, would fairly and reasonably compensate Fields for his damages, if any, that resulted from the Control Group's failure to comply with their agreement to purchase 9,000 of his shares? Consider the following elements of damages, if any, and none other:
a. The agreed purchase price;
b. The reasonable and necessary costs incurred by Lightfoot;
c. Reasonable and necessary expenses incurred in defense of the suit brought on Lightfoot's loan at First State Savings;

d. Damage to credit reputation that was a natural, probable and foreseeable consequence of the Control Group's failure to comply.
Do not include any amount for interest on past damages, if any.
Answer in dollars and cents for damages, if any, that—
　Were sustained in the past:
ANSWER: $290,000
　In reasonable probability will be sustained in the future:
ANSWER: $0
These questions were preceded by the following instruction:
　You are instructed that if you answer questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the Court when it applies the law to your answers at the time of judgment.

tation.[12] Appellants also overlook several elements of Lightfoot's damages: agreed purchase price, reasonable and necessary costs, reasonable and necessary legal expenses. By challenging some elements of Fields' and Lightfoot's contractual damages but not others, appellants run the risk of losing their sufficiency challenge if there is at least one element of Fields' and Lightfoot's contractual damages that is supported by legally and factually sufficient evidence. *See Zrubeck*, 850 S.W.2d at 589.

### Fields' Damages

In addition to testimony concerning the unpaid balance on the agreement with Lieb to sell his shares of stock in Crown Bank, Fields also testified that he has been sued by the RTC for the full amount of the unpaid principal on his promissory note to First State, or $93,993.00, with $42,551.59 in accrued interest as of April 3, 1992, together with interest accrued since that date, for a total amount due under the guarantee agreement of $193,800.00. The RTC's petition also included a demand for $2,500.00 in attorneys' fees, and an additional $5,000.00 for each appellate level to which an appeal is taken.

Much of Fields' damages testimony concerned "lost investment" or "lost income" opportunities, and damage to his credit reputation. He testified that, beginning in 1985, he became involved with several other investors including another member of the Control Group, Dr. Bertino, in a series of highly complex medically-related business transactions. Although the corporate structure changed several times, at the core of these transactions were two companies called Rehabtex, Inc. and Rehabtex Services, Inc., which were formed to develop a series of outpatient physical rehabilitation centers in Texas. Rehabtex and Rehabtex Services sold a series of limited partnerships concerning outpatient physical therapy rehabilitation to individuals in the medical field. Rehabtex was supposed to be the general partner; the limited partners would be referring physicians. Rehabtex Services would provide the

billing, collection, budgeting, accounting, and administrative support. Rehabtex and Rehabtex Services were, in turn, owned by several other corporate entities, among them Orion Medical Group (OMG) and Rehabco, Inc., a Pennsylvania corporation owned by an investor named Rick Actman. Like Dr. Bertino, Fields owned a percentage of the Orion Medical Group, Rehabtex, and several other closely related corporate entities. Fields, however, said he was forced to sell his interest in all of these outside ventures by August of 1989, because he could not come up with his share of a $15,000.00 tax debt— $6,400.00—that Orion Medical Group owed the IRS. Fields stated that he had tried to borrow $2,500.00 from a San Antonio bank to meet his share of the obligation, but was unable to do so. In any event, the minutes of the August 9, 1989 meeting of the board of directors of the Orion Medical Group (O.M.G.)—Michael H. Bertino, William R. Fields, and Charles V. Heath—show that Dr. Bertino agreed to pay the tax obligation. In return, Fields sold his OMG stock to Dr. Bertino, receiving $17,000.00 for his equity in the company. Fields resigned from OMG and all affiliated companies and corporations; he remained on the board of directors of Rehabtex, Inc., but retained no voting rights. Fields claimed he had no ownership interest in any of these ventures after the August, 1989 board meeting.

Fields blamed his financial losses on a poor credit rating, claiming his continuing indebtedness with First State, which was listed on his credit report, hampered his ability to borrow money. Fields introduced a copy of his credit report, dated July of 1989, which showed that he owed First State Savings $94,000.00 with a delinquency of $14,000.00.

Fields also testified regarding the future profitability of his outside interests. He testified that Orion Medical Group was the general partner in a limited partnership which had an interest in the San Antonio Imaging Center—including the right to 50 percent of the net profits and 20 percent of the radiology fees. According to Fields, this center was

---

**12.** The brief filed by Pitman adopts the arguments contained in Baker's brief, and Haass does

not raise the issue.

generating over $400,000.00 in revenues by April of 1988 as a result of physician referrals. Fields, a stock broker by training, estimated these outside business interests would have been worth approximately $590,-800.00 by the time of the trial had he not been forced to sell them. More specifically, he claimed his net interest in Rehabtex would have been worth approximately $200,-000.00 by the time of trial, had he not been forced to sell it. To arrive at the larger figure, however, Fields essentially claimed that if this sum had been invested in a series of other ventures, for example, a company called Sunport Medical, it would have run the $200,000.00 into $590,000.00.

Dr. Carl Hubbard, the appellees' expert witness on damages, estimated that if Fields had still owned these outside business interests at the time of trial—three years after their sale—they would have been worth $204,481.70. Hubbard testified at length regarding these highly complex business transactions. However, Hubbard's testimony concerned only Fields' resulting or consequential damages; the damages that resulted from the sale of Fields' stock and the failure of the appellants to pay the alleged purchase price. He said he was not asked to make such calculations regarding the sale of Lightfoot's stock.

In *Mead v. Johnson Group, Inc.*, 615 S.W.2d 685 (Tex.1981), the Texas Supreme Court explained:

> The 1980 Supplement to Corbin on Contracts states "there is no good reason why damage to credit rating should not be compensable in contract." 2 Corbin, Contracts § 1007 (Kaufman Supp.1980). Recognition that loss of credit may be a foreseeable result of breach of contract is in line with the realities of today's economy. To recover for loss of credit, as with any element of contract damage, it must be proved that the injury was the natural, probable, and foreseeable consequence of the breach of contract or there are no actual damages. *See Hadley v. Baxendale, supra,* at 354; Restatement (Second) of Contracts § 365 (Tent.Draft 1979). This is not a departure from the general rule of contract damages, but only recognition of an element of dam-

ages if proven. *We hold that actual damages for loss of credit or injury to credit reputation in an action for breach of contract may be recovered when there is evidence that loss of credit was a natural, probable, and foreseeable consequence of the defendant's breach.*

*Id.* at 688 (emphasis added). Given the broad form submission of Fields' contractual damages and the uncontested evidence regarding lost income and damage to his credit reputation, we hold that the evidence is legally and factually sufficient to support Fields' damages award.

### Lightfoot's Damages

Although there is no testimony regarding damage to Lightfoot's credit reputation, he claimed he had been sued by the RTC for over $436,000.00, and that he had paid an attorney $3,000.00 to defend him in that lawsuit. In addition, there was testimony concerning the agreement with Lieb to sell his shares of stock in Crown Bank. This is only $3,000.00 less than the amount which the jury awarded Lightfoot—$253,000.00. Lightfoot's testimony as to the $3,000.00 in attorneys' fees supports the remainder of the jury's award. We therefore hold there is both legally and factually sufficient evidence in this record to support the jury's award of $253,000.00 in contractual damages for Lightfoot. Appellants' points are overruled.

### Individual Purchase

Appellants argue the trial court should have submitted a question to the jury asking whether each member of the Control Group individually agreed to purchase the appellees' stock. The questions tendered by Baker and the Davilas would have asked the jury whether "Dwight Lieb, as agent for each of the following named control group members and with each member's authority to do so, agreed to purchase O. Waymond Lightfoot Jr.'s 25,000 shares of Crown Bancshares stock?" The jury would have been asked to answer yes or no for each member of the Control Group, including Fields. The trial court refused these questions as well as identical questions pertaining to Fields.

Appellants base their argument on the contention that the Control Group is an unincorporated association. They cite the general rule that unincorporated associations [13] are not liable on their contracts, which are regarded as the liability of the individuals who sign them. *Hutchins v. Grace Tabernacle United Pentecostal Church*, 804 S.W.2d 598, 599 (Tex.App.—Houston [1st Dist.] 1991, no writ); *see also Cox v. Thee Evergreen Church*, 836 S.W.2d 167, 169 (Tex.1992). In *Hutchins*, the only case cited by appellants on this issue, the court noted that the members of an unincorporated association were not bound by unauthorized acts or unratified representations of an individual member. *Id.* However, the court also noted that members of an association become liable on a contract made in their name if they assent to or ratify it. *Id.*

As we have already noted, the appellees' case against the Control Group was based on a theory of agency and ratification—even if Lieb did not have the authority to negotiate a stock repurchase agreement with Fields and Lightfoot, the Control Group ratified the agreement. Since appellants waived any complaint regarding the jury's agency findings, and the agency and ratification findings are supported by legally and factually sufficient evidence, whether the Control Group is a legal entity is immaterial. Any collective group of individuals may act through a common agent. *See* RESTATEMENT (SECOND) OF AGENCY § 20 Comment f. ("A number of persons ... may act jointly in the authorization of an agent. In such case, the agent may have power to subject them to joint liability to third persons ..."). The fact that Fields and Lightfoot were both members of the Control Group makes the resulting contractual arrangement somewhat unusual, but it does not invalidate the agreement.

It may be supposed, for example, that an arrangement is entirely inoperative if it purports to be made by a partnership or other unincorporated association with a member of such association. There is no reason why such an agreement should not operate as a valid and enforceable contract

between the individual member and the other members of the association that purports to make the agreement. For the purpose of giving a judicial remedy and for other practical purposes, there is nothing to prevent a court from treating the association of individuals as if it were an independent unit. . . . It may well be that an agreement made in this way should be subjected to severe scrutiny in the search for fraud and illegality. Yet the mere fact that the agreement purports to be made between the unincorporated association and one of its members does not in itself prove fraud or illegality.

1 CORBIN ON CONTRACTS § 3.1 (Rev. ed. 1993). In fact, since appellants jointly appointed Lieb, his only real authority was to act for their joint account. *See* RESTATEMENT (SECOND) OF AGENCY § 41(1) ("Unless otherwise indicated, authority given by two or more principals jointly includes only authority to act for their joint account."). An agent's promise necessarily binds his principals to the promised undertaking. *See Ames v. Great Southern Bank*, 672 S.W.2d 447, 450 (Tex.1984). Through their agent, Lieb, all of the appellants made the same promise to the appellees. *See* RESTATEMENT (SECOND) OF CONTRACTS § 288 Comment c ("It has been said that when two or more persons undertake a contractual obligation they are presumed to undertake it jointly and that 'words of severance' are necessary to overcome the presumption."). We therefore hold the trial court did not err in refusing to ask the jury whether appellants individually agreed to purchase the appellees' stock. Appellants' points are overruled.

### *Prorata Liability*

■■■ Appellants also claim the trial court should have asked the jury whether the agreement, and, consequently, the Control Group's purchase, was based on prorata liability. Baker and the Davilas submitted proposed questions, which were refused by the trial court, asking whether the agreement to buy Fields' and Lightfoot's shares was "limit-

**13.** "An unincorporated association is a voluntary group of persons, without a character, formed by mutual consent for the purpose of promoting a

common enterprise or prosecuting a common objective." BLACK'S LAW DICTIONARY, 1531–32 (6th ed. 1990).

ed to buying such control group member's pro rata portion of such stock."

Citing no authority or discussing any law to support their contentions, appellants claim that Lieb's letter and its attachments "unequivocally" show that the responsibility of the Control Group members was based on their individual stock ownership in Crown Bancshares. They also refer us to evidence, including testimony from the appellees, which indicates the stock purchases were based on the appellants' proportionate ownership in the bank. Appellants argue that if this evidence did not establish their prorata liability as a matter of law, it required the trial court to submit the issue to the jury. Again, however, we disagree.

In the law of contracts, joint and several liability usually arises when two or more promisors in the same contract promise the same or different performances to the same promisee. *See* RESTATEMENT (SECOND) OF CONTRACTS §§ 288, 289 (1981); *see also* CORBIN ON CONTRACTS § 928 (West Pub. Co. 1951) ("Each Joint Promisor is Bound For the Whole Performance Promised."). Texas law is no different—obligations of multiple parties to a contract are usually "joint and several." *See Marynick v. Bockelmann,* 773 S.W.2d 665, 668 (Tex.App.—Dallas 1989), *rev'd on other grounds,* 788 S.W.2d 569 (Tex. 1990); *Guynn v. Corpus Christi Bank & Trust,* 620 S.W.2d 188, 190 (Tex.Civ.App.—Corpus Christi 1981, writ ref'd n.r.e.). In answering questions one and two of the court's charge, the jury found the Control Group agreed to purchase the appellees' stock. Appellants do not challenge the legal or factual sufficiency of the evidence supporting these findings. They raised the issue of limitations, which we have already overruled. Since there is legally and factually sufficient evidence that the Control Group promised, though their agent, Lieb, to buy the appellees' stock, it makes no difference whether their duty was "joint and several." Consequently, the trial court did not err in refusing to ask the jury whether the agreement was based on prorata liability. The appellants' points are overruled.

### Joint and Several Liability

Appellants also claim the trial court erred in awarding contractual damages jointly and severally. Building on their previous argument, appellants claim the trial judge erred in awarding appellees the full amount of the contractual damages found by the jury because, as a matter of law, appellants were liable for only their prorata share. Once again, however, appellants cite no authority or discuss any law to support their contentions. We have already explained that the trial court did not err in refusing to ask the jury whether the agreement was based on prorata liability, and we need not discuss the issue again. Appellants' points are overruled.

### Texas Securities Act

As for the appellees' claims under TEX. REV.CIV.STAT.ANN. art. 581–33 (Vernon Supp. 1996), the Texas Securities Act, appellants raise two arguments: (1) they argue the claim itself is barred under the limitations period contained in article 581–33(H)(2); and (2) they claim the evidence is both legally and factually insufficient to support the jury's answers to questions 15 and 16 of the court's charge, which concerned liability and damages for securities fraud. Both of these arguments have merit.

### Statute of Limitations

The limitations period for claims under the Texas Securities Act is found in article 581–33(H), which provides that suit cannot be brought: (1) "more than three years after discovery of the untruth or omission," or after discovery should have been made by the exercise of reasonable diligence; or (2) "more than five years after the purchase;" or (3) more than one year after rejecting a rescission offer. TEX.REV.CIV.STAT.ANN. art. 581–33(H)(2) (Vernon Supp.1996). However, a claim under the Texas Securities Act may "in no event" be made more than five years after the sale. *Williams v. Khalaf,* 802 S.W.2d 651, 655 n. 3 (Tex.1990); *see also* TEX.REV.CIV.STAT.ANN. art. 581–33(H) cmt. (Vernon Supp.1996).

The question then becomes whether, for purposes of limitations, we consider the sale

of Fields' and Lightfoot's stock to have occurred on May 19, 1987, the date of Lieb's letter to the Control Group, or the earlier dates referenced in Lieb's letter and accompanying writing—October 1, 1986 for Lightfoot; April 20, 1987 for Fields. Given that the appellees' original petition was filed on November 25, 1991, if we calculate the five-year limitations period from September or October of 1986, Lightfoot's securities fraud claims are barred. Fields' claim, however, would not be barred if we used the April, 1987 date referenced in Lieb's letter to the Control Group. Furthermore, if we consider the sale to have occurred on May 19, 1987, the date of Lieb's letter, neither claim is barred by limitations. Not surprisingly, appellees therefore argue that under the law of merger, May 19, 1987 becomes the effective date of the sale, rather than the earlier oral agreements referenced in Lieb's letter.

 The "merger doctrine" is a corollary to the parol evidence rule in contract cases. Merger refers to the extinguishment of one contract by its absorption into another subsequent contract and is largely a matter of intention of the parties. *Leon Ltd. v. Albuquerque Commons Partnership,* 862 S.W.2d 693, 701 (Tex.App.—El Paso 1993, no writ); *Smith v. Smith,* 794 S.W.2d 823, 827 (Tex.App.—Dallas 1990, no writ). Merger occurs when the same parties to a prior agreement subsequently enter into a written integrated agreement covering the same subject matter. *Leon Ltd.,* 862 S.W.2d at 700; *Boy Scouts of America v. Responsive Terminal Systems, Inc.,* 790 S.W.2d 738, 744 (Tex. App.—Dallas 1990, writ denied). The question of whether a merger has occurred, or whether an agreement is merely additional to and not contradictory of a written contract, is determined from the intent of the parties. *See Smith,* 794 S.W.2d at 827–28; *Smith v. U.S. Nat'l Bank of Galveston,* 767 S.W.2d 820, 823 (Tex.App.—Texarkana 1989, writ denied). Absent pleading and proof of ambigu-

ity, fraud, or accident, a written instrument presumes that all prior agreements of the parties relating to the transaction have been merged into the written instrument. *Boy Scouts of America,* 790 S.W.2d at 745.

 Appellants' argument overlooks two important points. First, we have already held that the issue of ambiguity was raised in the appellants' pleadings, and the trial judge did not err in concluding the May 19, 1987 document was ambiguous or in submitting the issue to the jury. Insofar as the parol evidence rule and the doctrine of merger are concerned, this means we cannot disregard the earlier dates referenced in Lieb's letter. Second, and more importantly, article 581–33(H) clearly provides an optimum limitations period of five years for securities fraud claims, and this limitations period is measured from the date of the "purchase or sale," not the date of the agreement. *See Williams v. Khalaf,* 802 S.W.2d at 655 n. 3; *see also* TEX.REV.CIV.STAT.ANN. art. 581–33(H) cmt. (Vernon Supp.1996). In this case, Lieb's letter and the accompanying documents pinpoint the dates of the sale: October 1, 1986 for Lightfoot, and April 20, 1987 for Fields. Furthermore, this is consistent with the appellees' own testimony: Fields and Lightfoot repeatedly testified they were entitled to payment for their stock beginning in April of 1987 with respect to Fields, and in September or October of 1986 as to Lightfoot. Since the appellees' original petition was not filed until November of 1991, Lightfoot's claims under the Texas Securities Act are barred by the five-year limitations period.[14] We therefore sustain the appellants' applicable points of error insofar as they pertain to Lightfoot's securities fraud claim; we overrule them as to Fields' claim.[15] We will address appellants' remaining arguments only as they apply to Fields.

 One final question concerns the status of appellant, Rodolfo Davila, as trustee of

---

**14.** There is a discrepancy between Lieb's letter and the accompanying documents regarding the date when Lightfoot's stock was sold. The letter states that the sale occurred in September of 1986, while the accompanying documents indicate that the stock sale occurred on October 1, 1986. In either event, however, Lightfoot's

claims are barred by the five-year limitations period contained in article 581–33(H).

**15.** These points include Baker's twenty-eighth, twenty ninth, and thirtieth points of error; the Davilas' eighth point; Pitman's twenty-third point; and Haass' third point.

his deceased father's estate. The appellees' original petition named only Frank Davila II and Rodolfo Davila, individually, as appellants. The "Rodolfo L. Davila Estate Trust" was not joined as a defendant until December 14, 1992, when the appellees filed their second amended petition. The Davilas therefore argue that the trustee and the trust cannot be liable to either appellee under the five-year limitations period contained in the securities statute, because they were joined as appellants more than five years after Lieb's letter to the Control Group. Again, however, we disagree.

Although an amended pleading normally supersedes and supplants the original, an original pleading tolls the limitations period for claims asserted in subsequent, amended pleadings as long as the amended pleading does not allege a wholly "new, distinct, or different transaction or occurrence." *See* TEX.CIV.PRAC. & REM.CODE ANN. § 16.068 (Vernon 1986). The subsequent pleading "relates back" to, and is considered as having been filed at the time of the initial pleading, at least for limitations purposes. *See Stevenson v. Koutzarov,* 795 S.W.2d 313, 319 (Tex. App.—Houston [1st Dist.] 1990, writ denied); *Meisler v. Republic of Texas Savings Ass'n,* 758 S.W.2d 878, 881–882 (Tex.App.—Houston [1st Dist.] 1988, no writ). This rule applies to claims under the Texas Securities Act. *See Nicholas v. Crocker,* 687 S.W.2d 365, 368 (Tex.App.—Tyler 1984, writ ref'd n.r.e.) (Appellees' first amended petition under Texas Securities Act was not subject to plea of limitations, where original petition, based on fraud, was not subject to plea of limitations and amended petition was not based on new, distinct or different transaction or occurrence). A review of the appellees' original petition and their subsequent amended petitions, leaves no doubt that the same evidence supports all of their causes of action, the measure of damages is the same, and that the allegations are subject to the same defenses. We therefore conclude that Fields' securities fraud claims against the "Rodolfo L. Davila Estate Trust" are not barred by limitations.

### Liability and Damages for Securities Fraud

Appellants raise three arguments regarding appellees' securities fraud claims: (1) the appellees cannot recover damages under the Texas Securities Act, but may only obtain rescission since they still own the securities; (2) there is neither legally nor factually sufficient evidence that any member of the Control Group made untrue statements or omissions regarding the securities purchased; and (3) the trial court should have submitted each individual's liability separately. The second issue is what concerns us here.

Fields and Lightfoot sought damages for misrepresentations pursuant to the Texas Securities Act. TEX.REV.CIV.STAT.ANN. art. 581–1, *et seq.* (Vernon 1964 & Supp.1996). Article 581–33(B) of the Act provides:

A person who offers to buy or buys a security (whether or not the security or transaction is exempt under Section 5 or 6 of this Act) *by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading,* is liable to the person selling the security to him, who may sue either at law or in equity for rescission or for damages if the buyer no longer owns the security. However, a person is not liable if he sustains the burden of proof that either (a) the seller knew of the untruth or omission, or (b) he (the offeror or buyer) did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.

(Emphasis added).

The statute provides remedies of both rescission and damages. Part D of article 581–33 provides that on rescission, a plaintiff who was a defrauded seller is to recover the security (or a security of the same class and series) upon tender of the consideration the seller received for the security plus interest thereon at the legal rate from the date the seller received the consideration, less the amount of any income the buyer received on the security. *Id.* at 581–33(D)(2). A plaintiff who was a defrauded seller may recover the value of the security at the time of the sale

plus the amount of any income the buyer received on the security, less the consideration paid the seller for the security, plus interest on these sums at the legal rate from the date of payment of the seller. *Id.* at 581–33(D)(4).[16]

The act does not define "offers to buy or buys." However, the commentary to article 33(B) states that the provision is to be construed similarly to article 33(A), which provides remedies for defrauded buyers of securities. *See* TEX.REV.CIV.STAT.ANN. art. 581–33(B) cmt. (Vernon Supp.1996) ("The phrase 'offers to buy or buys' is to be construed like the corresponding phrase for sales in §§ 33(A)(1) and 33(A)(2)."). Turning to the statutory definitions, we note that they define "sale," "offer for sale" or "sell" to "include every disposition, or attempt to dispose of a security for value." *Id.* at 581–4(E). Moreover, one who "offers or sells" a security is not limited to those who pass title. *See Pinter v. Dahl,* 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). The act further defines "sell" as any act by which a sale is made, including a solicitation to sell, an offer to sell, or an attempt to sell, either directly or by an agent or salesman. TEX. REV.CIV.STAT.ANN. art. 581–4(E) (Vernon Supp.1996). By analogy, the terms "offer to buy" or "buy" should therefore include every acquisition of, or attempt to acquire, a security for value. This would include the transaction in the present case.

Like article 33(B), article 33(A)(2) renders a seller liable only if he sells or offers to sell a security *by means of* an untrue statement or omission. One court of appeals has held that the wording of subsection (A)(2) requires the defrauded buyer to prove that the untrue statements related to the security and induced the purchase. In other words, the plaintiff must show the untrue statements were made before the sale occurred. *See Nicholas,* 687 S.W.2d at 368. In *Nicholas,* the court held that a buyer of

an interest in oil and gas wells failed to establish a violation of article 581–33(A)(2) because he did not show the seller's representations were made before the sale. The court construed the article 581–33(A)(2),

> to mean that in order for the plaintiff/buyer to prevail, he must introduce evidence that the untrue statements relate to the security purchased and induced the purchase thereof. Thus untrue statements made about a security by a seller to the buyer thereof at a time when the buyer has already purchased the security are not the "means" by which the security was sold. It follows, then, that if a buyer was not induced to purchase a security by an untrue statement made after the purchase, he could not have been misled thereby, and no further statements respecting such security are required to explain the original statement so made under the provisions of the above statute.

*Id.* at 368. *See also Calpetco 1981 v. Marshall Exploration, Inc.,* 989 F.2d 1408, 1418 (5th Cir.1993) (Citing *Nicholas v. Crocker,* and noting that "Article 581–33A(2) has been construed to mean that the alleged misrepresentation must relate to the security and 'induce the purchase thereof.' "). Given the statutory directive that article 33(B) and 33(A) "are intended to be construed similarly," *see* TEX.REV.CIV.STAT.ANN. art. 33(B) cmt. (Vernon Supp.1996), these rules apply equally well to our analysis of Fields' and Lightfoot's claims. We therefore conclude, like the *Nicholas* court, that under article 33(B) of the Texas Securities Act, the alleged untruth or material omission must have related to the security and "induced the purchase thereof."

In the present case, the only allegations regarding statutory securities fraud are found in paragraph ten of the appellees' amended petition:

---

**16.** Two other provisions are worth noting. Part F imposes joint and several liability on anyone who "directly or indirectly controls a seller, buyer, or issuer of a security" and on anyone who "directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security." *Id.* at 531–33(F)(1)(2). Part M provides that "[t]he rights and remedies provided by this Act are in addition to any other rights (including exemplary or punitive damages) or remedies that may exist at law or in equity." *Id.* at 581–33(M).

The Control Group agreed (and if not, fraudulently offered and misrepresented to FIELDS and LIGHTFOOT) to purchase Fields' and Lightfoot's shares of CROWN stock for Ten Dollars ($10.00) per share. FIELDS and LIGHTFOOT relied on that agreement and representation. Each member of the Control Group, CROWN, and each Trustee, directly or indirectly, with intent to deceive or disregard or reckless disregard for the truth, aided in the misrepresentations regarding the purchase. Further, CROWN and each Trustee who directly or indirectly controlled the Control Group, were aware of the agreements to purchase, and failed to ensure that the purchase price be paid. Because the purchase was not consummated as represented, the acts and failures to act by CROWN, the Control Group, and the Trustees directly and proximately caused damages to FIELDS and LIGHTFOOT.

Appellees claim there is more than enough evidence to support the jury's findings. They argue, for example, there is evidence from which the jury could have concluded, or at least inferred, that the Control Group failed to disclose their intent not to pay Fields and Lightfoot unless they could secure an overall restructuring of the entire $5.2 million loan for their own benefit. Unfortunately, however, they provide no citations to the record in support of these assertions.

In this case, there is simply no evidence there were any untrue statements or omissions regarding the stock itself. We recognize that a person who offers to buy or buys a security by means of any untrue statement of a material fact may be liable to the person selling the security who does not know of the untruth. Similarly, liability may be imposed on a buyer who fails to state a material fact that is necessary to prevent other statements from being misleading in light of the circumstances under which they were made. *See* WILLIAM V. DORSANEO III, TEXAS LITIGATION GUIDE § 171.03[1][d] (1995). In the present case, however, the evidence does not show a violation of the Texas Securities Act, but simply a breach of contract. The evidence

alluded to by the appellees concerns how they were to be paid for the stock and the fact they were continually told after the sale that it would go through—not evidence of an untrue statement or material omission relating to the stock itself at the time of purchase. Simply offering to purchase stock and then failing to pay for it does amount to an untruth or material omission, nor can omissions which occur only after the sale be the "means" by which a purchaser "offers to buy or buys" the security. To hold otherwise would transform every breach of contract involving a sale of securities into a statutory violation, a result certainly not intended by the Texas Legislature when it drafted article 33(B). We therefore hold, as a matter of law, that Fields has not established a violation of article 33(B) of the Texas Securities Act. Accordingly, we sustain the appellants' relevant points of error insofar as they attack the legal sufficiency of the jury's answers to questions fifteen and sixteen of the court's charge—liability and damages for statutory securities fraud.[17] We reverse that portion of the court's judgment and render judgment that Fields take nothing.

### Rescission

Since we have already determined that Lightfoot's securities fraud claims are barred by limitations, and that Fields' cause of action fails as a matter of law, we need not address the rescission argument raised by the appellants.

### Damages

Appellants raise several arguments regarding the damages awarded by the trial court. Prominent among these complaints is their contention that the trial court erred in cumulating the jury's actual damages findings in questions five, six, ten, thirteen, sixteen and then awarding the total sum to the appellees.

The trial court rendered judgment against appellants on April 12, 1993. Unless otherwise indicated, the following awards were against all of the appellants, jointly and severally, except Rodolfo Davila individually:

---

**17.** These include Baker's twenty-third through twenty-sixth points; the Davilas' seventeenth point; Pitman's seventeenth point; and Haass' fifteenth point.

| | LIGHTFOOT | FIELDS |
|---|---|---|
| Breach of Contract | $ 253,000.00 | $ 290,000.00 |
| Prejudgment interest (10%) [18] | $ 131,698.63 | $ 150,958.90 |
| Attorneys' fees | $ 153,879.45 | $ 176,383.56 |
| | | |
| Trustees' Breach of Fiduciary Duties [19] | –0– | $ 200,000.00 |
| Prejudgment interest (10%) | –0– | $ 104,109.58 |
| Attorneys' fees | –0– | $ 121,643.00 |
| | | |
| Directors' Breach of Fiduciary Duties [20] | $ 3,000.00 | $ 42,551.59 |
| Prejudgment interest (10%) | –0– | $ 22,150.15 |
| Attorneys' fees | $ 1,200.00 | $ 25,880.70 |
| | | |
| Exemplary Damages for Directors' Breach of Fiduciary Duties | | |
| | | |
| Fred L. Baker | –0– | $ 1,750.00 |
| Michael H. Bertino | –0– | $ 1,500.00 |
| Frank Davila II | –0– | $ 5.00 |
| Lawrence F. Haass | –0– | $ 250.00 |
| Kim I. Manning | –0– | $ 250.00 |
| J. Pat O'Connell | –0– | $ 1,000.00 |
| J. Brian O'Connor | –0– | $ 500.00 |
| B.F. Pitman III | –0– | $ 1,750.00 |
| | | |
| Texas Securities Act | $ 253,000.00 | $ 332,551.59 |
| Prejudgment interest (10%) | $ 131,698.63 | $ 173,109.04 |
| Attorneys' fees | $ 153,879.45 | $ 202,264.25 |
| | | |
| Postjudgment Interest | 10% | 10% |
| | | |
| **TOTAL DAMAGES:** | $1,081,356.16 | $1,848,607.36 |

---

Appellants raised the issue of double recovery of damages in their motions for new trial and for judgment notwithstanding the verdict. Both then and now, they base their arguments on two closely related principles of law: (1) that an injured party is entitled to only one satisfaction for his loss, *Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1 (Tex.1991); and (2) when an injury consists only of economic loss to the subject of a contract, the action sounds in contract alone. *Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617, 618 (Tex.1986). It is the first rule which we address here.

### *Cumulation of Damages; Double Recovery*

■ The single recovery, or one satisfaction rule, is a rule of general acceptance that an injured party is entitled to one satisfaction for sustained injuries. *Stewart Title,* 822 S.W.2d at 7. A party who seeks redress under two or more theories of recovery for a single wrong must elect, before the judgment is rendered, under which remedy he wishes the court to enter a judgment. *Star Houston, Inc. v. Shevack,* 886 S.W.2d 414, 422 (Tex.App.—Houston [1st Dist.] 1994), *writ denied per curiam,* 907 S.W.2d 452 (Tex. 1995); *American Baler Co. v. SRS Systems, Inc.,* 748 S.W.2d 243, 246 (Tex.App.—Houston [1st Dist.] 1988, writ denied); *Thate v. Texas & Pacific Ry. Co.,* 595 S.W.2d 591, 595 (Tex.Civ.App.—Dallas 1980, writ dism'd). An election is not necessary until after the verdict. *International Piping Systems, Ltd. v. M.M. White & Assoc., Inc.,* 831 S.W.2d 444, 452 (Tex.App.—Houston [14th Dist.] 1992, writ denied). But where the prevailing party fails to make that election, the trial court should use the findings affording the

---

**18.** The awards of prejudgment simple interest were calculated from January 20, 1988 until the date of judgment.

**19.** This award is against defendants Fred L. Baker and Frank Davila II, jointly and severally.

**20.** This award is against defendants, Fred L. Baker, Michael H. Bertino, Frank Davila II, Lawrence F. Haass, Kim I. Manning, J. Pat O'Connell, J. Brian O'Connor, and B.F. Pitman III, jointly and severally.

greater recovery and render judgment accordingly. *Birchfield v. Texarkana Memorial Hosp.*, 747 S.W.2d 361, 367 (Tex.1987); *see also Southern County Mutual Ins. Co. v. First Bank & Trust of Groves*, 750 S.W.2d 170, 173–74 (Tex.1988) (noting that bank's pleadings set forth alternative grounds of recovery, and that appeals court reversibly erred in rendering a judgment based on both grounds of recovery pled). If the trial court fails to do so, the appellate court will reform the trial court's judgment to effect such an election. *Star Houston*, 886 S.W.2d at 422; *Koutzarov*, 795 S.W.2d at 322; *American Baler Co.*, 748 S.W.2d at 246, 250.

In support of their argument that they should recover for all theories under which the jury awarded damages, appellees cite *Birchfield v. Texarkana Memorial Hospital*, 747 S.W.2d 361 (Tex.1987). In *Birchfield*, the plaintiffs sued a hospital alleging gross negligence and DTPA[21] violations. Although the jury was asked only a single question on actual damages, it awarded both exemplary damages under the gross negligence claim and treble damages under the DTPA claim. *Id.* at 367. The court held that "[i]n the absence of separate and distinct findings of actual damages on both the acts of negligence and the deceptive acts or practices, an award of exemplary damages and statutory damages would be necessarily predicated upon the same finding of actual damages and would amount to a double recovery of punitive damages." *Id.*

Fields and Lightfoot argue that because they obtained separate jury findings of actual damages on each cause of action, they were entitled to recover on each cause of action. *Birchfield*, however, simply does not support this conclusion. The case addresses only the issue of when statutory and exemplary damages are both available in DTPA cases. It does not hold that jury findings on multiple theories of recovery automatically support duplicate awards of actual damages. As we have already noted, although a party may assert any and all causes of action it may have against another, it is limited to only one

recovery of damages. *See Jones v. Rainey*, 168 S.W.2d 507, 509–10 (Tex.Civ.App.—Texarkana 1942, writ ref'd n.r.e.).

A review of the jury's findings leaves no doubt that the damages awarded by the trial court were cumulative. Beginning with the contractual damages awarded to Fields in question six, $290,000.00, we note again that the only evidence which could support this finding is the unpaid balance on his First State note, $90,000.00, plus $200,000.00 for the loss of outside business interests, as calculated by his expert witness, Dr. Hubbard. As for Lightfoot, the only support in the record for the $253,000.00 which the jury awarded him in question number five is the unpaid balance on his First State note, $250,-000.00, plus $3,000.00 which he paid as attorneys' fees to defend the lawsuit brought by the RTC.

The damages for the trustees' and directors' breach of fiduciary duties are strikingly similar to the contractual damages. The trustees' breach of fiduciary damages were zero for Lightfoot and $200,000.00 for Fields. Coincidentally, however, this $200,-000.00 figure is exactly what Fields testified to as the damages for loss of his outside business interests. The damages for the directors' breach of fiduciary duties were $3,000.00 for Lightfoot and $42,551.59 for Fields. As we have already noted, however, Lightfoot testified that he paid $3,000.00 in attorneys' fees to defend the lawsuit brought by the RTC. Similarly, Fields testified that the interest calculated by the RTC in the original purchase of his stock was $42,551.59.

The jury's answers to the securities fraud questions are even more intriguing. Lightfoot's damages, $253,000.00, correspond precisely to the contractual damages that he received in the jury's answer to question number five. If one adds Fields' contractual damages, $290,000.00, and his damages for the directors' breach of fiduciary duties, $42,-551.49, the total is $332,551.59. This is precisely what the jury awarded him in its an-

---

21. Damages under the DTPA are cumulative, and simultaneous recovery with another legal theory is generally allowed. *Murphy v. Seabarge, Ltd.*, 868 S.W.2d 929, 937 (Tex.App.—Houston [14th

Dist.] 1994, writ denied). But, to obtain such a cumulative recovery, separate findings of actual damages for each act complained of are required. *Birchfield*, 747 S.W.2d at 361, 367.

swer to question number six for statutory securities fraud.

A review of the appellees' pleadings only reinforces our conclusion that their damages are based on the same acts or omissions. The appellees' second amended petition prefaces Fields' and Lightfoot's actual damages with the statement they are based on "the acts of breach of contract, misrepresentation, negligent misrepresentation, fraud, breach of fiduciary duty, negligence, gross negligence, and securities fraud." What follows, however, is a discussion that looks suspiciously contractual in nature—purchase price of the stock; principal and interest due; and, in the case of Fields, loss of business interests because of the appellants' failure to discharge his note at First State. Except for the punitive damages, which the jury awarded only in small amounts, there are no damages peculiar to tort claims of any kind. Indeed, each element mentioned is of a type one would normally expect to see in a lawsuit for breach of contract. The essence of all these claims is the failure of the appellants to pay for Fields' and Lightfoot's stock under the contract.

 Our review of the pleadings and the record leaves no doubt that the appellees' claims for breach of contract, breach of trustees' and directors' fiduciary duties, and statutory securities fraud are all based on the same acts or omissions. We therefore sustain the appellants' points of error regarding cumulation of actual damages.[22] Because we have already concluded that the appellees' securities fraud claims fail as a matter of law, and as between the remaining claims, the damages awarded by the jury for the breach of contract are clearly greater, we hold that appellees are entitled to recover only the damages for breach of contract. Thus, we reverse that portion of the trial court's judgment which awarded Fields and Lightfoot actual and exemplary damages for breach of fiduciary duty, and render judgment that

Fields and Lightfoot take nothing for this claim. Our application of the double recovery rule also eliminates the exemplary damages which the jury awarded Fields in its answer to the second part of question fourteen. Punitive damages are not recoverable for a breach of contract absent an independent tort with accompanying actual damages. *Texas Nat'l Bank v. Karnes*, 717 S.W.2d 901, 903 (Tex.1986) (per curiam). Because of our holding, we do not address the appellants' points regarding either breach of trustees' or directors' fiduciary duties—questions seven through fourteen of the court's charge.[23] These points are denied as moot.

### Attorneys' Fees

Appellants also argue that the trial court erred in awarding judgment to the appellees for attorneys fees because, as a matter of law, attorneys' fees are not recoverable for any of the appellees' causes of action except breach of contract. We have already concluded that the appellees' claims for breach of fiduciary duty and securities fraud cannot stand close scrutiny. This leaves only the attorneys' fees for breach of contract, which the appellants argue should have been awarded on a prorata basis rather than imposed jointly and severally. Appellants, however, failed to object to questions eighteen and nineteen of the court's charge, which asked the jury to assess a "reasonable fee for the necessary services" of the appellees' attorneys, stated as "a percentage of recovery." The jury's answer, forty percent, therefore stands unless there is some indication in the record that appellants preserved the issue by objection.

Our review of the record finds they made no such objection. The only objection to questions eighteen and nineteen was as follows: "On the attorney's fees, there is no evidence that the fee charged for the necessary services was reasonable. Counsel did not give any testimony on whether that was a

---

22. This includes Baker's thirty-second and thirty-third points; the Davilas' ninth point of error; Pitman's twenty-sixth point; and Haass' sixth point.

23. This includes points ten through twenty-two, twenty-eight through thirty, in Baker's brief; points five through seven, fourteen through sixteen, in the brief filed by the Davilas; points ten and eleven, thirteen through sixteen, and twenty-four, in the brief filed by Pitman; and point fourteen in Haass' brief.

reasonable fee or not ..." There was no mention of prorating attorneys' fees, nor did appellants submit a question or instruction in that regard. It is well-settled that to preserve error in the charge, a party must make objections to the court's charge or submit requests for additional questions, instructions, or definitions. The test is whether the party made the trial court "aware of the complaint, timely and plainly," and obtained a ruling. *State Dept. of Highways & Public Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992). Because appellants failed to do this, we overrule their points of error. We now address their remaining arguments.

### Prejudgment Interest

Appellant, Lawrence Haass, claims the trial court erred in awarding prejudgment interest to appellees "on any of the theories of recovery advanced." Our resolution of the appellees' breach of fiduciary duty and securities fraud claims leaves prejudgment interest for breach of contract as the only remaining issue.

In his appellate brief, Haass' point is grouped with three other points of error which attack attorneys' fees, exemplary damages, and the trial court's decision to cumulate damages—issues we have already discussed. There is no argument or authority regarding attorneys' fees, save for the cryptic statement that "[a]ppellees were awarded pre-judgment interest and attorneys' fees on each respective theory," an apparent reference to cumulation of damages. Haass' brief purports to adopt pages 21–28 of the brief filed by the Davilas, and pages 47 and 48 of Baker's brief. However, the Davilas do not discuss prejudgment interest for breach of contract, except to remind us the breach of contract claim is barred by limitations—an issue we have already resolved. Baker says only that prejudgment interest, like attorneys' fees, should have been prorated. Once again, however, he fails to tell us how or why it should have been prorated, and his brief offers no argument or authority on the subject. If in fact, the trial court erred in awarding prejudgment interest for breach of contract, appellees' only remaining claim, appellants have not even told us how the trial

court erred, much less whether the error "was reasonably calculated to cause and probably did cause rendition of an improper judgment in the case." TEX.R.APP.P. 81(b)(1). Their points, therefore, are overruled.

### Default Judgment Against Crown Bancshares

Appellants also argue that the trial court erred in awarding a default judgment against Crown Bancshares, the holding company. After the close of the evidence, the appellees' counsel moved for a judgment by default or, in the alternative, an instructed verdict against Crown Bancshares. Crown Bancshares had filed an answer in the case but made no appearance in the trial. The court reserved ruling until after the verdict, at which time it granted the default. We note, however, that Crown Bancshares, Inc. has not perfected an appeal from the trial court's judgment, only individual members of the Control Group have done so. Therefore, their points are overruled.

### Jury Deliberations; Motion for Mistrial

Appellants also argue that the trial court erred in overruling their motions for mistrial based on improper jury communication. Shortly after the jury received the court's exhibits, the charge, and retired to deliberate, it asked the trial court whether there was an exhibit list that could be used as a reference to locate certain exhibits. The only exhibit list in existence was appellees' exhibit number 128, a list which contained all of the appellees' exhibits that were offered at trial, along with a description of each item. The list also contained handwritten comments in the margins which indicated whether the exhibits had been admitted or denied, and a series of initials which seem to indicate during whose testimony they were admitted, e.g., "LF," "RF," or "FB."

The trial judge granted the jury's request. The appellees prepared a revised exhibit list which contained only the exhibits which had been admitted at trial, along with a brief description of each item. The appellees submitted their list to the bailiff the following morning. The appellants had apparently

been given an opportunity to submit their own exhibit list, but were late in doing so.

The bailiff provided the appellees' exhibit list to the jury upon receipt. The appellants telephoned the court clerk and advised the court they would be late in submitting their exhibit list. At that time, they were informed that the appellees' list had already been given to the jury. The trial judge, who was not in chambers, was contacted and instructed the bailiff to withdraw the appellees' exhibit list.

The appellants moved for mistrial. The bailiff testified that he thought he had complied with the court's instruction and that the appellees' exhibit list was in the jury room for approximately fifteen minutes before it was removed. The appellants argued that the appellees' descriptions of the exhibits contained editorial comments about the exhibits and their evidentiary significance which harmed the appellants' case.[24] They noted that the appellees' list omitted exhibit sixteen, the letter where Frank Davila II had given notice of the June, 1986 Control Group meeting, a document which was admitted into evidence. The trial court denied the motion for mistrial.

Appellants argue that the exhibit list harmed their case because it "contained editorial comments concerning appellees' opinions as to the effect of the exhibits," and because the appellants were never given an opportunity to inspect the list before it was given the jury. Appellees maintain the trial court did not abuse its discretion in denying the appellants' motion for mistrial because there is no evidence of an improper jury communication, or that the brief presence of the exhibit list in the jury room was "reasonably calculated to cause and probably did cause rendition of an improper" verdict. We agree.

Generally, the granting or denying of a motion for mistrial is reviewed under an abuse of discretion standard. *See Ussery v.*

*Gray*, 804 S.W.2d 232, 237 (Tex.App.—Fort Worth 1991, no writ) (disqualification of attorney); *Mendoza v. Ranger Ins. Co.*, 753 S.W.2d 779, 781 (Tex.App.—Fort Worth 1988, writ denied) (jury selection). In addition to showing an abuse of discretion, appellants must also show that the trial court's error, if indeed there was error, "was reasonably calculated to cause and probably did cause rendition of an improper judgment in the case." *See* TEX.R.APP.P. 81(b)(1). In this case, however, neither showing has been made. The points are overruled.

### Cumulative Error

In one of their final points, appellants argue that the combined or cumulative effect of the trial court's alleged errors deprived them of a fair trial and due process of law. While some errors are not considered reversible, all errors considered together could present cumulative error requiring reversal. *Fibreboard Corp. v. Pool*, 813 S.W.2d 658, 695 (Tex.App.—Texarkana 1991, writ denied); *Klein v. Sporting Goods, Inc.*, 772 S.W.2d 173, 179 (Tex.App.—Houston [14th Dist.] 1989, writ denied). "To determine if a cumulation of errors denied the appellants their right to a fair trial and due process of law, all errors in the case will be considered along with the record as a whole to determine if the errors collectively were calculated to cause and probably did cause the rendition of an improper judgment." *Fibreboard*, 813 S.W.2d at 696; TEX.R.APP.P. 81(b)(1). Before we may reverse a judgment and order a new trial based on cumulative error, however, we must determine whether the error committed by the trial court was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *Fibreboard*, 813 S.W.2d at 695–96; TEX. R.APP.P. 81(b)(1). Appellants must therefore show that, based on the record as a whole, but for the alleged errors, the jury would have rendered a verdict favorable to them.

---

24. For example, they took issue with the title: "Fields and Lightfoot v. Crown Bank Control Group." They also complained of the appellees' descriptions of exhibits 17 ("O'Connor correspondence to Crown Board of Directors re: Lightfoot shares will soon be ready for sale"), 27 ("Lieb informs Control Group of purchase of Lightfoot and Fields shares"), 45 ("First State Savings (Dennis Jones) letter to Boldrick offers to restructure loans upon: 1) transfer of the stock or a letter instructing First State Savings to transfer stock to Lieb; and 2) payment of all past due interest"), and 84 ("Bertino takes over Fields' stock in Orion Medical Group").

*See Fibreboard,* 813 S.W.2d at 695. This they cannot do.

Although appellants attack specific rulings of the trial court, e.g., the motion in limine, they do not assert that, but for the cumulative effect of these errors, the jury would probably have rendered a verdict in their favor. Nor do we believe appellants have met their burden in this regard. We have considered all their allegations of error and we specifically find that the errors committed by the trial court do not constitute cumulative error. As another court noted, albeit under different circumstances: "[t]here are few errorless trials, especially those of the length of this proceeding." *Id.* at 696. We have carefully reviewed the record and each of appellants' 104 points of error, and we do not find cumulative error that would have probably caused the jury to render a verdict in favor of the appellants. Because we do *not find* any cumulative error that probably caused the jury to render an improper verdict, appellants' points are overruled.

### Notice Under the Texas Trust Code

The Davilas also argue that the trial court erred in rendering judgment against the Rodolfo L. Davila Estate Trust because there is neither factually nor legally sufficient evidence that appellees gave notice to the beneficiaries of the trust under § 115.015 of the Texas Trust Code.

The purpose of § 115.015 is to assure trust beneficiaries that "their interest will be protected, [and] that a potential conflict of interest will not threaten the adequacy of their interests' representation." *Nacol v. McNutt,* 797 S.W.2d 153, 154 (Tex.App.—Houston [14th Dist.] 1990, writ denied). "The trustee is required to provide a list of beneficiaries within eleven days of the request for such list. A plaintiff satisfies the notice requirements of this section when he notifies those persons on the list provided by the trustee within the time prescribed by the statute." *Corum Management Co., Inc. v. Aguayo Enterprises, Inc.,* 755 S.W.2d 895, 900–901 (Tex. App.—San Antonio 1988, writ denied).

The appellees' original petition and first amended petition named only "Rudy" Davila and Frank Davila II, individually, as appellants, but the second amended original petition, filed on December 14, 1992, added the Rodolfo L. Davila Estate Trust as a defendant. This amended petition announced that,

> notice is hereby given that the Trustee, Rodolfo Davila, provide Appellees a list of all beneficiaries and their addresses within (10) days of the receipt of this AMENDED PETITION. However, to the extent that the Trustee's production of a list of beneficiaries is not forthcoming or is not timely provided to Appellees; Appellees request that the Court enter an order setting a deadline, which is more than (30) days prior to the date of judgment, by which notice must be given to the beneficiaries.

There is no indication in the record whether the trial court ever entered such an order. The Davilas' answer informed the trial court that "[t]he appellees have failed to give proper notice to the beneficiaries of the Rodolfo L. Davila Estate Trust as is required under the Texas Trust Code." In an amended motion for new trial and/or to "modify, correct and reform the judgment" the Davilas again claimed "[t]here was no evidence that the appellees and/or intervenor [trustee of Fields' bankruptcy estate] gave notice to the beneficiaries of the Rodolfo L. Davila Estate Trust that is required by the Texas Trust Code."

Apart from these tantalizing bits of information, however, we have no further indication from the parties whether notice to the trust beneficiaries was required, ordered, or even given. There is no mention of the evidence, arguments, or authorities that were presented to the trial court regarding the judgment that was rendered. We also note that although appellees claim they "provided notice to the beneficiaries identified by the trustee by certified mail, which was received by all identified beneficiaries," their brief provides no citations to the record that would support this assertion. Even so, the burden is on appellants, not the appellees, to show error that "was reasonably calculated to cause and probably did cause rendition of an improper judgment in the case." *See* Tex. R.App.P. 81(b)(1). The Davilas have failed to

meet this burden. Their point, therefore, is overruled.

### Cross Claims and Counterclaims for Contribution and Indemnity

The Davilas also argue that the trial court erred because it failed to grant judgment for them based on their cross-claims and counterclaims for indemnity and contribution. Again, we disagree.

The Davilas, like the other appellants, filed cross-claims against their fellow appellants and counterclaims against the appellees. The basis for the Davilas' cross-claim was that if any defendant was adjudged liable to the appellees on the contract claim and/or the tort claims, they would be entitled to contribution from those co-defendants who were also held responsible.

The basis for the counterclaims filed by the Davilas and the other appellants apparently concerns the appellees' status as members of the Control Group. As Control Group members, the appellees were responsible, albeit at reduced ownership, for the purchase of each other's stock. Since they have not paid their respective shares of the purchase price for each other's stock, they are, according to appellants, liable along with them.

As a practical matter, however, the appellees did not sell the stock to themselves and should not, therefore, be liable to themselves for any part of the appellants' liability. More to the point, no appellant introduced evidence or requested jury questions on contribution or indemnity issues. No appellant argued at trial that the appellees' damages should be reduced or in some way impacted by indemnity or contribution. It was the appellants' burden to request jury issues in substantially correct wording and to secure a ruling on them by the trial court. TEX.R.CIV.P. 278, 279; *General Resources Organization, Inc. v. Deadman,* 907 S.W.2d 22, 33 (Tex.App.—San Antonio 1995), *writ denied,* 932 S.W.2d 485 (Tex.1996). They failed to do either. As a result, any counterclaims or cross-claims for contribution and indemnity, whatever their basis, were waived. The points are overruled.

### Haass' Motion for Directed Verdict & Judgment NOV

Haass also argues that the trial court erred in denying his motion for directed verdict and for a judgment notwithstanding the verdict. His appellate brief attacks the legal and factual basis for three of the appellees' claims—breach of fiduciary duty, breach of contract, and statutory securities fraud. However, since we have already examined the appellees' claims for breach of contract and securities fraud, and since a discussion of the breach of fiduciary duty claim is unnecessary in view of our application of the double recovery rule, we deny these points of error as moot.

### Conclusion

In summary, we affirm only that portion of the trial court's judgment which awards liability and damages for breach of contract. Lightfoot is therefore entitled to $253,000.00 damages for breach of contract, $131,698.63 for prejudgment interest, and $153,879.45 in attorneys' fees, together with 10 percent postjudgment interest. Fields will receive $290,000.00 damages for breach of contract, $150,958.90 for prejudgment interest, and $176,383.56 for attorneys' fees, plus ten percent postjudgment interest. These sums are recoverable against all of the appellants, jointly and severally, except Rodolfo Davila individually. However, we reverse those parts of the trial court's judgment which award liability and damages for breach of trustees' and directors' fiduciary duties, and for violations of the Texas Securities Act. We render judgment that Fields and Lightfoot take nothing for these claims.